# Exhibit A

**STARK & STARK**
A Professional Corporation
By:     Benjamin E. Widener, Esquire (Atty ID #006412006)
993 Lenox Drive, Bldg. 2
Lawrenceville, New Jersey 08648
(609) 896-9060 (office)
(609) 895-7358 (direct)
(609) 895-7395 (fax)
bwidener@stark-stark.com
*Attorneys for Plaintiff-Movant The James Monroe*
*Condominium at Newport, Inc.*

| | |
|---|---|
| THE JAMES MONROE CONDOMINIUM AT NEWPORT, INC., | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION, HUDSON COUNTY** |
| Plaintiff-Movant, | **DOCKET NO.: HUD-L-** |
| v. | *Civil Action* |
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ, | **VERIFIED COMPLAINT TO VACATE ARBITRATION AWARD** |
| Defendant-Respondent, | |
| with | |
| JOHN REYES, | |
| as Interested Party. | |

Plaintiff-Movant The James Monroe Condominium at Newport, Inc. ("**James Monroe**" or

"**Plaintiff**"), by and through counsel, respectfully commences this summary proceeding against

Defendant Service Employees International Union, Local 32BJ ("**Defendant**," "**32BJ**," or the

"**Union**"), with notice to John Reyes ("**Reyes**") as an Interested Party, by way of Verified

Complaint and Order to Show Cause, and in support thereof hereby alleges and states as follows:

<u>**NATURE OF ACTION**</u>

1.      This action is filed pursuant to New Jersey Court Rule 4:67-1, <u>et</u> <u>seq.</u>, and <u>N.J.S.A.</u>

2A:24-7 and -8, to vacate the arbitration Opinion and Award rendered on or about February 14,

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

2020 (the "**Award**") by Arbitrator Gary Kendellen in connection with Office of the Contract Arbitrator Case No. 52510-19 entitled _In the Matter of the Arbitration between Kyle Bragg, President, Local 32BJ, Service Employees International Union and James Monroe Condominium c/o First Service Residential_, which found that James Monroe did not have just cause to discharge its former employee, Local 32BJ member and Interested Party John Reyes ("**Grievant**" or "**Reyes**"), and awarded Grievant reinstatement with backpay and benefits.  A true and correct copy of the Award is attached hereto as Exhibit "A."

## **PARTIES**

2.      At all relevant times, Plaintiff The James Monroe Condominium at Newport, Inc., a New Jersey non-profit corporation, has maintained its principal address located at 45 River Drive South, Jersey City, Hudson County, New Jersey 07310.

3.      Defendant Service Employees International Union, Local 32BJ is a labor organization maintaining its headquarters and principal office located at 25 West 18th Street, New York, New York 10011.

4.      The Union is, and at all relevant times was, the exclusive bargaining representative of certain employees of Plaintiff employed at The James Monroe Condominium at Newport (the "**Premises**") in Jersey City, New Jersey, including all porters, handymen, doormen, and maintenance and concierge employees.

5.      John Reyes is an individual residing at 334 Bergen Avenue, Jersey City, New Jersey 07304, and is being noticed as an "Interested Party" to this action upon whom service shall be effectuated.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

2

4832-5167-7336, v. 1

## JURISDICTION AND VENUE

6.      Venue is appropriately laid in the Superior Court of New Jersey, Law Division, Hudson County, under and pursuant to Rule 4:3-2(a)(3), as at least one party to the action resides in Hudson County and the transactions at issue took place in Hudson County.

7.      This Court has jurisdiction and venue of this summary proceeding under N.J.S.A. 2A:24-7, which provides a party may commence a summary action in Superior Court to vacate an arbitrator's award within three (3) months after the award is delivered.

8.      The Opinion and Award of Arbitrator Kendellen in the above-captioned matter, dated February 14, 2020, was received by Plaintiff on or about February 18, 2020, making this action timely.

## BACKGROUND

9.      James Monroe and the Local 32BJ were and are parties to a Collective Bargaining Agreement (the "**CBA**") effective from January 1, 2016 through December 31, 2019, which set forth the terms and conditions of employment of the collective bargaining unit composed of certain employees including, among others, porters, doormen and concierge employees employed by James Monroe at the Premises, a residential condominium located at 45 River Drive South, Jersey City, New Jersey.  A true and correct copy of the CBA between James Monroe and 32BJ is attached hereto as Exhibit "B."

10.     The CBA contains a two-step grievance procedure pursuant to which any disputes, differences, controversies or grievances arising out of the collective bargaining relationship between James Monroe and the Union, including alleged violations of the CBA, are to be resolved,

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

3

4832-5167-7336, v. 1

with all matters that cannot be resolved at Step 1 being submitted to binding arbitration.  See Exh. "B," Art. 14.

11.      The underlying arbitration and Award from which Plaintiff appeals arises from a dispute between James Monroe and the Union concerning James Monroe's discharge of Grievant John Reyes, a James Monroe employee in the bargaining unit represented by the Union and covered by the CBA.

12.      The Grievant, John Reyes, was employed by James Monroe at the Premises from in or around May 2012 until March 7, 2019, most recently as a Concierge, in which position he was assigned to the Package Room.

13.      Reyes is and at all relevant times was a member of Defendant Local 32BJ.

14.      On March 7, 2019, James Monroe discharged Mr. Reyes after a video recording review of Mr. Reyes' workspace over a six-week period showed Mr. Reyes' minimal performance of his duties, that he spent excessive time preoccupied with social media and video games on his cell phone, that he allowed minor children to share his workspace and help him perform his duties despite risk of injury, and that he often neglected his video monitoring duties, thereby creating safety and security issues for James Monroe.

15.      As a result of its review of Mr. Reyes' performance in the video recordings, James Monroe terminated Mr. Reyes' employment for his negligence in a position that had important safety and security responsibilities, which he had ignored.

16.      Following the termination of Mr. Reyes' employment, the Union filed a grievance on his behalf pursuant to the grievance procedure set forth in Article 14 of the CBA, challenging the discharge as "unjust" under Article 13 of the CBA ("Discharges"), which provides, "No regular full-time employee shall be discharged except for just cause."  See Exh. "B," Art. 13.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

4

17.     The Award at issue stems from that grievance.

18.     After the dismissal was upheld at the first stage of the grievance procedure, the Union advanced the matter to arbitration with the Office of the Contract Arbitrator, Case No. 52510-19, on or about August 20, 2019.

19.     Arbitrator Gary Kendellen was designated by the parties to arbitrate the dispute.

20.     The parties referred the following issue to Arbitrator Kendellen: "Did the Employer have just cause to discharge John Reyes?  If not, what shall be the remedy?"  See Exh. "A," at 2.

21.     An arbitration hearing was held before Arbitrator Kendellen, who conducted the hearing between the Parties over three days—October 26, 2019, December 16, 2019, and January 16, 2020.

22.     During the three days of hearings, witnesses were called and certain evidence was presented, including documentary and video-recorded evidence.  True and correct copies of those documentary exhibits introduced at the hearing and referenced in the Opinion and Award (Exhibit Nos. ER 1, 2, 3, 4, 5, 6A-D, 8A-C, 9, and 10) are attached hereto as Exhibit "C."[1]

23.     The Arbitrator did not allow James Monroe to introduce all of the evidentiary materials it sought to rely upon at arbitration.

24.     Specifically, James Monroe sought to introduce evidence showing that almost immediately after receiving his termination notice on March 7, 2019, Mr. Reyes bypassed building security software to gain unauthorized access to the James Monroe e-mail system and send a building-wide e-mail to all of its residents that was inflammatory of Board President Padman Palani.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

---

[1] Exhibit Nos. ER 7 and 12, the video recordings of Mr. Reyes at his workspace, also were introduced and admitted at arbitration.

4832-5167-7336, v. 1

25.     The Arbitrator, however, refused to allow the evidence because it related to and demonstrated Mr. Reyes' post-termination misconduct, i.e., events that occurred after Mr. Reyes received his termination letter.

26.     Arbitrator Kendellen refused to consider Mr. Reyes' post-termination misconduct as a basis for determining whether James Monroe had just cause to terminate Mr. Reyes' employment for reasons independent of the reasons upon which James Monroe originally relied in discharging Mr. Reyes on March 7, 2019, and similarly refused to consider what effect such misconduct had on the remedy to be awarded.

27.     On February 14, 2020, Arbitrator Kendellen issued his written Opinion and Award, sustaining the grievance filed on behalf of Mr. Reyes and awarding him reinstatement to his former position "with full back pay and benefits." See Exh. "A," at 16.

28.     In his 16-page Opinion and Award, Arbitrator Kendellen found that the circumstances of Mr. Reyes' termination did not amount to "just cause" for James Monroe to discharge Mr. Reyes on March 7, 2019.  Id.

29.     Although the Arbitrator acknowledged that Mr. Reyes engaged in the alleged misconduct and malperformance as summarized in the Opinion and Award and detailed in James Monroe's documentary, testimonial, and video evidence introduced during the arbitration hearing, he ruled against James Monroe and found no just cause for Mr. Reyes' discharge because, the Arbitrator felt, James Monroe did not adhere to traditional progressive discipline principles before "abruptly" terminating Mr. Reyes' employment.

30.     The Arbitrator agreed that Mr. Reyes' conduct as displayed in the video recordings submitted demonstrated that he was careless and neglectful in his job, and that he lacked remorse, but the Arbitrator also found Mr. Reyes' actions did not constitute the type of conduct traditionally

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

6

4832-5167-7336, v. 1

warranting "summary termination instead of progressive discipline."  In reach this decision, the Arbitrator relied heavily on Reyes' long-term employment with only a couple documented and acknowledged prior warnings, and the fact that Management was unable to identify the specific residents who had complained about Mr. Reyes' behavior that ultimately led to James Monroe's decision to conduct its video review into Mr. Reyes' conduct in March 2019.

31.     Though the Arbitrator acknowledged that Mr. Reyes engaged in misconduct and malperformance, he reasoned that such conduct could be corrected through training, counselling and other steps that, if not successful, could be followed by a sequence of warnings, verbal and/or written; suspension or suspensions of varying lengths, as appropriate; and ultimately termination, in the event the misconduct or poor performance is not corrected.

32.     The Arbitrator stated that he "fully agree[d]" with James' Monroe's asserted position that it "need not be forced to "tolerate an employee's poor performance when it leaves it at risk of damage until it suffers the damage," but apparently believed that traditional notions and principles of progressive discipline trumped an employer's right and interest in taking swift and immediate action to prevent significant harm or damage before it happens, explaining:

> And while the Employer urges that it need not be forced to tolerate an employee's poor performance when it leaves it at risk of damage until it suffers the damage, a principle with which the Undersigned fully agrees, it is also true that every employee that makes a mistake or error that is correctable, even if it could subject an employer to damage, does not thereby become an employee subject to summary termination. Rather, that employee is subject to not only correction, but also to only the appropriate level of discipline for such mistake or error, in the context of his or her prior tenure and record.

33.     Ultimately, the Arbitrator rejected James Monroe's position that it had to discharge Mr. Reyes' immediately (as it did) due to the threat his conduct, performance, and neglect posed

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

7

to the safety, well-being and security of building residents and certain juveniles with whom he engaged while on the job.

34.     Thus, Arbitrator Kendellen found James Monroe did not have just cause to discharge Mr. Reyes on March 7, 2019, and ordered James Monroe to reinstate Mr. Reyes to his former position with full backpay and benefits.

35.     Neither the Opinion and Award itself nor the rest of the record contains any information, evidence, testimony, analysis, determination, or reference to the existence and/or extent of Mr. Reyes' interim earnings or income during the period he was unemployed by James Monroe, nor to whether Mr. Reyes made any efforts to mitigate his damages by finding new or interim employment or other work.

36.     The Arbitrator did not elicit any testimony or argument on the issue of mitigation or offset for interim earnings and the Award is silent on that issue.

37.     At no time did either party have an opportunity to present evidence and/or make arguments as to the components or implementation of a damages award.

38.     The Arbitrator did not consider Mr. Reyes' post-employment misconduct in determining whether reinstatement was an appropriate remedy.

## FIRST COUNT
### Summary Action: Vacation of Arbitration Award – Remedy of Reinstatement

39.      Plaintiff repeats and realleges each and every allegation contained in the previous paragraphs of this Verified Complaint as if fully set forth herein.

40.     N.J.S.A. 2A:24-7 provides that "[a] party to the arbitration may, within 3 months after the award is delivered to him, unless the parties shall extend the time in writing, commence

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

8

4832-5167-7336, v. 1

a summary action in the court aforesaid for the confirmation of the award or for its vacation, modification or correction."

41.     In reviewing private sector arbitration awards, courts must vacate those that run contrary to existing law and/or public policy.

42.     Enforcement of the Arbitrator's Opinion and Award would run against public policy because reinstatement of Mr. Reyes would serve to condone and undermine James Monroe's dedicated efforts to protect and promote the safety, well-being, and security of its workforce and residents.

43.     Vacation of the Award also is warranted pursuant to <u>N.J.S.A.</u> 2A:24-8(c) because the Arbitrator refused to hear or consider evidence that was and is pertinent and material to the controversy submitted to arbitration.

44.     As a result of the foregoing, the arbitrator's Award should be vacated and the matter should be remanded to the Arbitrator for re-arbitration as to the proper remedy.

**WHEREFORE,** Plaintiff-Movant The James Monroe Condominium at Newport, Inc. respectfully requests that this Honorable Court enter an Order:

(a)     **VACATING** the Arbitration Award issued and served by Arbitrator Gary Kendellen of the Office of the Contract Arbitrator on or about February 14, 2020, in connection with Case No. 52510-19, entitled *In the Matter of the Arbitration between Kyle Bragg, President, Local 32BJ, Service Employees International Union and James Monroe Condominium c/o First Service Residential*, rendered in favor of Defendant, in which the Arbitrator reinstated the grievant, John Reyes, to his former position with Plaintiff with backpay;

(b)     **DIRECTING** a rehearing by the Arbitrator and rendering of a new award that strikes the requirement that the grievant, John Reyes, be reinstated, and determines the amount of backpay owed in light of proper offsets for income and amounts earned or received by the grievant from interim employment or other sources subsequent to the date of his discharge by Plaintiff; and

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

9

4832-5167-7336, v. 1

(c)     Granting any such other relief as this Court may deem equitable, necessary and just.

## SECOND COUNT
### Summary Action: Vacation of Arbitration Award –
### Calculation of Backpay and Mitigation of Damages

45.     Plaintiff repeats and realleges each and every allegation contained in the previous paragraphs of this Verified Complaint as if fully set forth herein.

46.     N.J.S.A. 2A:24-7 provides that "[a] party to the arbitration may, within 3 months after the award is delivered to him, unless the parties shall extend the time in writing, commence a summary action in the court aforesaid for the confirmation of the award or for its vacation, modification or correction."

47.     The Court vacate the Award and remand the matter to arbitration because pursuant to N.J.S.A. 2A:24-8(d) because the Arbitrator's Award is not a final and definite award on all submitted issues.

48.     The Award did not address or resolve the issue of mitigation of damages or offset for any interim income or earnings received by Mr. Reyes during the period he was unemployed by James Monroe.

49.     As a result of the foregoing, the arbitrator's Award should be vacated and the matter should be remanded to the Arbitrator for re-arbitration as to the proper remedy

WHEREFORE, Plaintiff-Movant The James Monroe Condominium at Newport, Inc. respectfully requests that this Honorable Court enter an Order:

(d)     VACATING the Arbitration Award issued and served by Arbitrator Gary Kendellen of the Office of the Contract Arbitrator on or about February 14, 2020, in connection with Case No. 52510-19, entitled *In the Matter of the Arbitration between Kyle Bragg, President, Local 32BJ, Service Employees*

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

10

4832-5167-7336, v. 1

*International Union and James Monroe Condominium c/o First Service Residential*, rendered in favor of Defendant, in which the Arbitrator reinstated the grievant, John Reyes, to his former position with Plaintiff with backpay;

(e)     **DIRECTING** a rehearing by the Arbitrator and rendering of a new award that strikes the requirement that the grievant, John Reyes, be reinstated, and determines the amount of backpay owed in light of proper offsets for income and amounts earned or received by the grievant from interim employment or other sources subsequent to the date of his discharge by Plaintiff; and

(f)     Granting any such other relief as this Court may deem equitable, necessary and just.

STARK & STARK
A Professional Corporation


By: _____/s/ Benjamin E. Widener_____
      BENJAMIN E. WIDENER

Dated:  May 8, 2020

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

11

4832-5167-7336, v. 1

## **VERIFICATION**

I, Padman Palani, of full age, upon my oath, do hereby affirm and state as follows:

1.      I am the President of the Board of Trustees of the James Monroe Condominium at Newport, Inc. the Plaintiff-Movant in the above-captioned action and, as such, I am fully familiar with the facts and circumstances of this summary action.

2.      I have reviewed the contents of the Verified Complaint and hereby certify that all statements and allegations made therein are true and correct to the best of my knowledge, information and belief, and are made based upon my personal knowledge and from other information and documentation provided by representatives of James Monroe.

3.      I certify that the foregoing statements made by me are true. I understand that if the foregoing statements are willfully false, I am subject to punishment.

PADMAN PALANI
President, Board of Trustees
James Monroe Condominium at Newport, Inc.

Dated: May 8, 2020

STARK & STARK
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

12

4832-5167-7336, v. 1

### <u>CERITIFCATION PURSUANT TO RULE 1:4-4(c)</u>

I, Benjamin E. Widener, Esquire, do hereby certify to the genuineness of the facsimile signature of the Verification of Padman Palani, and do further certify that a copy of this Certification with the original signature will be filed if requested by the Court or by a party.

STARK & STARK
A Professional Corporation


By: _____/s/ Benjamin E. Widener_____
     BENJAMIN E. WIDENER

Dated:  May 8, 2020


### <u>CERTIFICATION PURSUANE TO RULE 4:5-1</u>

Pursuant to Rule 4:5-1, except as otherwise indicated or described herein, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other Court or of a pending arbitration proceeding to the best of my knowledge and belief.  Also, to the best of my knowledge and belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading and the previous pleadings, if any, at the present time we know of no other parties who should be joined in the within action.

STARK & STARK
A Professional Corporation


By: _____/s/ Benjamin E. Widener_____
     BENJAMIN E. WIDENER

Dated:  May 8, 2020

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

13

4832-5167-7336, v. 1

## DESIGNATION OF TRIAL COUNSEL

Pursuant to the provisions of <u>Rule</u> 4:25-4, the Court is advised that the undersigned is

hereby designated as Plaintiff's trial counsel.

STARK & STARK
A Professional Corporation


By: _____/s/ Benjamin E. Widener_____
        BENJAMIN E. WIDENER

Dated:  May 8, 2020

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

14

4832-5167-7336, v. 1

**STARK & STARK**
A Professional Corporation
By:     Benjamin E. Widener, Esquire (Atty ID #006412006)
993 Lenox Drive, Bldg. 2
Lawrenceville, New Jersey 08648
(609) 896-9060 (office)
(609) 895-7358 (direct)
(609) 895-7395 (fax)
bwidener@stark-stark.com
*Attorneys for Plaintiff-Movant The James Monroe*
*Condominium at Newport, Inc.*

| | |
|---|---|
| THE JAMES MONROE CONDOMINIUM AT NEWPORT, INC., | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION , HUDSON COUNTY** |
| Plaintiff-Movant, | **DOCKET NO.: HUD-L-** |
| v. | *Civil Action* |
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ, | |
| Defendant-Respondent, | **ORDER TO SHOW CAUSE VACATING ARBITRATION AWARD** |
| with | |
| JOHN REYES, | |
| as Interested Party. | |

**THIS MATTER**, having been presented to the Court on the application of Stark & Stark,

P.C., attorneys for Plaintiff-Movant The James Monroe Condominium at Newport, Inc.

("**Plaintiff**"), seeking relief by way of summary action pursuant to New Jersey Court Rule 4:67-

1, et seq., and in accordance with N.J.S.A. 2A:24-7 and -8, to vacate the arbitration Opinion and

Award issued by Arbitrator Gary Kendellen on February 14, 2020 (the "Award") in connection

with the Office of the Contract Arbitrator Case No. 52510-19 entitled *In the Matter of the*

*Arbitration between Kyle Bragg, President, Local 32BJ, Service Employees International Union*

*and James Monroe Condominium c/o First Service Residential*;

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

This Court, having reviewed and considered the Plaintiff's Verified Complaint and all supporting documents submitted therewith; having determined that this matter may proceed by way of Verified Complaint and Order to Show Cause as a summary proceeding pursuant to <u>N.J.S.A.</u> 2A:24-7 and New Jersey Court Rule 4:67-1, <u>et</u> <u>seq.</u>; and for good and sufficient cause shown;

IT IS, on this _____ day of _____, 2020,

**ORDERED** that Defendant-Respondent Service Employees International Union Local 32BJ ("**Defendant**") and John Reyes ("**Reyes**") (as an interested party) shall appear and show cause on the _____ day of _____, 2020 at _____ o'clock a.m./p.m., or as soon thereafter as counsel may be heard, before the Superior Court of New Jersey, Law Division, Hudson County, at the William Brennan Courthouse, 583 Newark Avenue, Jersey City, NJ 07306, as to why an Order should not be entered in favor of Plaintiff, as follows:

1.   **VACATING** the Arbitration Award issued and served by Arbitrator Gary Kendellen of the Office of the Contract Arbitrator on or about February 14, 2020, in connection with Case No. 52510-19, entitled *In the Matter of the Arbitration between Kyle Bragg, President, Local 32BJ, Service Employees International Union and James Monroe Condominium c/o First Service Residential*, rendered in favor of Defendant, in which the Arbitrator reinstated the grievant, John Reyes, to his former position with Plaintiff with backpay;

2.   **DIRECTING** a rehearing by the Arbitrator and rendering of a new award that strikes the requirement that the grievant, John Reyes, be reinstated, and determines the amount of backpay owed in light of proper offsets for income and amounts earned or received by the grievant from interim employment or other sources subsequent to the date of his discharge by Plaintiff; and

3.   Granting any such other relief as the Court deems necessary, equitable and just.

And IT IS further **ORDERED** that:

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

2

4821-6469-7240, v. 1

1.      A copy of this Order to Show Cause, Verified Complaint and all supporting affidavits, certifications or documents submitted in support of this application be served upon Defendant and Reyes (as an "**Interested Party**") within five (5) business days of receipt hereof, in accordance with New Jersey Court Rules 4:4-3 and 4:4-4, this being original process.

2.      Plaintiff must file with the Court its proof of service of the pleadings on the Defendant and Reyes no later than _____ days before the return date.

3.      Defendant and Reyes shall file and serve a written answer, affidavit and/or other papers in opposition to this Order to Show Cause and relief requested in Plaintiff's Verified Complaint, with proof of service of such filing, by the _____ day of _____, 2020. The answer (and other opposing papers, as the case may be) must be filed with the Clerk of the Superior Court in the County listed above, and a copy of the papers must be sent directly the chambers of the Honorable _____.

4.      Plaintiff must file and serve any written reply to any opposition to the Order to Show Cause by the _____ day of _____, 2020.  The reply papers must be filed with the Clerk of the Superior Court in the County listed above, and a copy of the papers must be sent directly the chambers of the Honorable _____.

5.      If <u>no</u> opposition to this Order to Show Cause is filed and served by or before the above-stated deadline, the Court shall deem the application unopposed and may proceed with this matter pursuant to New Jersey Court Rule 4:67-5 on an *ex parte* basis with Plaintiff's application being decided on the papers on the return date set forth herein, and relief may be granted by default, provided that Plaintiff has filed a proof of service and a proposed form of order prior to the return date.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

3

4821-6469-7240, v. 1

6.      If Plaintiff has not already done so, a proposed form of order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the Court no later than _____ days before the return date.

7.      Defendant and Reyes shall take notice that Plaintiff has filed a lawsuit in the Superior Court of New Jersey, Law Division, Hudson County.  The Verified Complaint attached to and filed with this Order to Show Cause states the basis of the lawsuit.  If Defendant and/or Reyes dispute the allegations set forth in the Verified Complaint and the relief sought by way of said Verified Complaint, Defendant and/or Reyes or their respective attorneys, must file a written answer and proof of service before the return date of the Order to Show Cause.

8.      These documents must be filed with the Clerk of the Superior Court in the County listed above.  A list of these offices is provided.  An appropriate filing fee payable to the "Treasurer State of New Jersey" must be included with such filing.  Defendant and/or Reyes, or their respective attorneys, also must send a copy of any answer to Plaintiff's counsel of record whose name and address appear above, or to Plaintiff, if no attorney is named above.  A telephone call will not protect your rights; you must file and serve your answer, with the fee, or judgment may be entered by default.

9.      If you cannot afford an attorney, you may call the Legal Services office in the county in which you live.  A list of these offices is provided.  If you do not have an attorney and are not eligible for free legal assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.  A list of these numbers is also provided.

10.     The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the Court and parties are advised to the contrary no later than _____ days

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

4

before the return date, or unless no appearance, answer, response or other papers are filed in opposition to this Order to Show Cause as set forth in Paragraph 5, above.

BY THE COURT:

_____

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

5

4821-6469-7240, v. 1

**STARK & STARK**
A Professional Corporation
By:    Benjamin E. Widener, Esquire (Atty ID #006412006)
993 Lenox Drive, Bldg. 2
Lawrenceville, New Jersey 08648
(609) 896-9060 (office)
(609) 895-7358 (direct)
(609) 895-7395 (fax)
bwidener@stark-stark.com
*Attorneys for Plaintiff-Movant The James Monroe*
*Condominium at Newport, Inc.*

| | |
|---|---|
| THE JAMES MONROE CONDOMINIUM AT NEWPORT, INC., | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION , HUDSON COUNTY** |
| Plaintiff-Movant, | **DOCKET NO.: HUD-L-** |
| v. | *Civil Action* |
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ, | |
| Defendant-Respondent, | **ORDER VACATING ARBITRATION AWARD** |
| with | |
| JOHN REYES, | |
| as Interested Party. | |

     **THIS MATTER**, having been presented to the Court on the application of Stark & Stark,

attorneys for Plaintiff-Movant The James Monroe Condominium at Newport, Inc. ("**Plaintiff**"),

and on notice to Defendant-Respondent Service Employees International Union Local 32BJ

("**Defendant**") and John Reyes ("**Reyes**"), as an Interested Party;

     This Court, having reviewed the papers submitted, and for good and sufficient cause

shown;

     IT IS, on this _____ day of _____, 2020,

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

**ORDERED** that the summary application filed by Plaintiff be and hereby is GRANTED; and it is further

**ORDERED** that, in accordance with <u>N.J.S.A.</u> 2A:24-7 and -8, the Arbitration Opinion and Award issued by Arbitrator Gary Kendellen of the Office of the Contract Arbitrator on or about February 14, 2020, in favor of Defendant and reinstating the grievant, John Reyes, to his former position with Plaintiff with backpay in connection with Case No. 52510-19, entitled *In the Matter of the Arbitration between Kyle Bragg, President, Local 32BJ, Service Employees International Union and James Monroe Condominium c/o First Service Residential*, be and hereby is **VACATED**; and it is further

**ORDERED** that the parties be and hereby are directed to submit to a rehearing by the Arbitrator for the rendering of a new award that strikes the requirement that the grievant, John Reyes, be reinstated, and determines the amount of backpay owed in light of proper offsets for income and amounts earned or received by the grievant from interim employment or other sources subsequent to the date of his discharge by Plaintiff; and it is further

**ORDERED** that a copy of this Order shall be served upon all parties and counsel of record within seven (7) days receipt hereof, and this matter is now closed.

BY THE COURT:

_____

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

4821-6469-7240, v. 1

THE JAMES MONROE CONDOMINIUM
AT NEWPORT, INC.,

        Plaintiff,

vs.

SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL 32BJ,

        Defendant,

with

JOHN REYES,

        as Interested Party

**SUPERIOR COURT OF NEW JERSEY**
**LAW DIVISION**
**HUDSON COUNTY**

**DOCKET NO. HUD-L-**

*Civil Action*

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE
AND VERIFIED COMPLAINT TO VACATE OR MODIFY ARBITRATION AWARD**

---

STARK & STARK
A Professional Corporation
993 Lenox Drive, Bldg. 2
Lawrenceville, New Jersey 08648-2389
(609) 896-9060
(609) 895-7395 (FAX)

*Attorneys for Plaintiff The James Monroe
Condominium at Newport, Inc.*

OF COUNSEL AND ON THE BRIEF:

BENJAMIN E. WIDENER, ESQUIRE

ON THE BRIEF:

CORY A. RAND, ESQUIRE

STARK & STARK
ATTORNEYS AT LAW

# **TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF FACTS ........................................................................................................ 3

LEGAL ARGUMENT ............................................................................................................... 3

      I.      Standard of Review........................................................................................... 3

      II.     The Arbitration Award Must Be Vacated Because It Violates and Runs
            Contrary to Existing Law or Public Policy .............................................. 4

      III.    The Arbitration Award Must Be Vacated Because the Arbitrator Refused
            to Consider Pertinent, Material Evidence ................................................. 9

      IV.    The Arbitration Award Must Be Vacated and Remanded to the Arbitrator
            for Further Proceedings Because It Lacks Finality and Definiteness as to the
            Calculation of Damages............................................................................ 11

CONCLUSION.......................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**CASE LAW**                                                                                                    PAGE

Abrams v. Lightolier, 841 F. Supp. 584 (D.N.J. 1994), aff'd, 50 F.3d 1204 (3d Cir. 1995) ........ 11

Amalgamated Meat Cutters v. Great Western Food Co., 712 F.2d 122 (5th Cir. 1983).............. 6

Amalgamated Transit Union, Local 1318 v. DeCamp Bus Lines, Inc.,
       382 N.J. Super. 418 (Law Div. 2005) .................................................................. 13

Ass'n of W. Pulp & Paper Workers, Local 78 v. Rexam Graphic, Inc.,
       221 F.3d 1085 (9th Cir. 2000).............................................................................. 10

Bd. of Educ. Of Borough of Alpha, Warren Cty. v. Alpha Educ. Ass'n,
       188 N.J. 595 (2006) ............................................................................................ 5

Borough of Glassboro v. Fraternal Order of Policy, Lodge No. 108, 197 N.J. 1 (2008) ........... 4, 5

Chicago Fire Fighters Union Local No. 2 v. City of Chicago,
       751 N.E.2d 1169 (Ill. App. 2001) ....................................................................... 6

Cty. Coll. of Morris Staff Ass'n. v. Cty. Coll. of Morris, 100 N.J. 383 (1985)............................ 3

Decker v. Bd. of Educ. of Elizabeth, 153 N.J. Super. 470 (App. Div. 1977) ............................ 12

Delta Air Lines, Inc. v. Air Line Pilots Ass'n. Int'l, 861 F.2d 665 (11th Cir. 1988) ..................... 6

Exxon Corp. v. Local Union 877, Int'l Bhd. of Teamsters, 980 F. Supp. 752 (D.N.J. 1997)......... 5

Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357 (3d Cir.1993) ............................5-6

Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d 1189 (3d Cir. 1993) .............................. 6

Faherty v. Faherty, 97 N.J. 99 (1984) ...................................................................... 7

Flagg v. City of Newark, No. A-0788-05T5, 2008 N.J. Super. Unpub. LEXIS 844
       (App. Div. July 15, 2008).......................................................................... 12

G.B. Goldman Paper Co. v. United Paperworkers Int'l Union, Local 286,
       957 F. Supp. 607 (E.D. Pa. 1997) ........................................................... 6

Goodman v. London Metals Exch., Inc., 86 N.J. 19 (1981) ................................................ 11, 12

Health Prof'ls & Allied Employees, Local 5091 v. Bergen Reg'l Med. Ctr. L.P., C.A.,
       No. 08-cv-1031, 2010 U.S. Dist. LEXIS 1460 (D.N.J. Jan. 8, 2010) ................... 14

In re Galloway Twp. Bd. of Educ., 157 N.J. Super. 74 (App. Div. 1978) ................... 12

Int'l Union of Operating Eng'rs, Local No. 841 v. Murphy Co., 82 F.3d 185 (7th Cir. 1996) .... 14

Iowa Elec. Light & Power v. Local Union 204, Int'l Bd. Of Elec. Workers,
    834 F.2d 1424 (8th Cir. 1987) ..................................................................... 6

Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361 (6th Cir. 1998) ............... 7

Liberty Mut. Ins. Co. v. Open MRI of Morris & Essex, L.P.,
    356 N.J. Super. 567 (Law Div. 2002) ........................................................... 6

Matteson v. Ryder Sys. Inc., 99 F.3d 108 (3d Cir. 1996) ............................................... 3

Metromedia Energy, Inc. v. Enserch Energy Servs., Inc., 409 F.3d 574 (3d Cir. 2005) ................ 3

Murray vs. Newark Hous. Auth., 311 N.J. Super. 163 (Law Div. 1998) .................................. 11

N.J. Tpk. Auth. v. Local 196, I.F.P.T.E., 190 N.J. 283 (2007) ..................................... 4, 5

Paper, Allied-Indus., Chem. and Energy Workers Int'l Union v. S.D. Warren Co.,
    382 F. Supp. 2d 130 (D. Me. 2005) ............................................................. 10

Penn. Nurses Ass'n, Local 729 v. John F. Kennedy Med. Ctr.,
    247 F. Supp. 2d 665 (E.D. Pa. 2003) .......................................................... 15

Phelps Dodge Corp. v. NLRB, 313 U.S. 177 (1941) ..................................................... 11

Porter v. Ascension Parish School Bd., 301 F. Supp. 2d 576 (M.D. La. 2004) ........................ 7-8

Riverside Sheriffs' Ass'n v. Cty. of Riverside, No. E050547,
    2011 Cal. App. Unpub. LEXIS 6907 (Sept. 13, 2011) ........................................... 14

Rogozinski v. Airstream by Angell, 152 N.J. Super. 133 (Law Div. 1977) ............................. 11

Sandler v. Lawn-A-Mat Chemical & Equipment Corp.,
    141 N.J. Super. 437 (App. Div. 1976) ......................................................... 11

Scotch Plains-Fanwood Bd. of Educ. V. Scotch Plains-Fanwood Educ. Ass'n,
    139 N.J. 141 (1995) ........................................................................... 3

Sheriff of Suffolk Cty. v. Jail Officers & Emples., 990 N.E.2d 1042, 1049-51 (Mass. 2013) ..... 14

Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995) ................................ 12

State v. AFSCME, Council 4, Local 2663, 758 A.2d 387 (Conn. App. 2000) ............................. 7

Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters,
    969 F.2d 1436 (3d Cir. 1992) .................................................................. 6

Telephone Workers Union of N.J., Local 827, Intern Broth. of Elec. Workers, AFL-CIO
    v. N.J. Bell Telephone Co., 450 F. Supp. 284 (D.N.J. 1977),
    aff'd 584 F.2d 31 (3d Cir. 1978) ................................................................................. 5

Tenet Healthsystem MCP, LLC v. Pa. Nurses Ass'n Local 712, No. 01-2201,
    2001 U.S. Dist. LEXIS 21535 (E.D. Pa. Dec. 20, 2001) ...................................... 14

Tretina Printing v. Fitzpatrick & Assocs., 135 N.J. 349 (1994) ................................. 4, 13

United Food & Commer. Workers Union Local 1776 v. Excel Corp.,
    470 F.3d 143 (3d Cir. 2006) ..................................................................................... 10

Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420 (1996) .................................. 5


**STATUTES**

N.J.S.A. 2A:24-7................................................................................................... *passim*

N.J.S.A. 2A:24-8................................................................................................... *passim*

ALM G.L. c. 150C, § 11 ............................................................................................. 14


**OTHER**

Columbus Show Case Co., 44 Lab. Arb. 507, 514 (1965) (Kates, Arb.) ...................... 10

## PRELIMINARY STATEMENT

Plaintiff The James Monroe Condominium at Newport, Inc. ("**Plaintiff**" or "**James Monroe**") respectfully submits this memorandum in support of its action against Defendant Service Employees International Union, Local 32BJ ("**Defendant**," "**32BJ**," or the "**Union**") pursuant to N.J.S.A. 2A:24-7 and -8, seeking to vacate the arbitration award (the "**Award**") issued by Arbitrator Gary Kendellen dated February 14, 2020, which ordered the reinstatement of former James Monroe employee, Grievant John Reyes ("**Mr. Reyes**" or "**Grievant**"), with full backpay and benefits.  The deference courts typically pay private arbitration awards is not without limits, and this is a case in which those limits have clearly been exceeded.  As set forth in detail herein, the Award must be vacated under well-settled principles of arbitral review.

With respect to the award of reinstatement, Arbitrator Kendellen's Award cannot be sustained as an appropriate or viable remedy under the circumstances of this case and/or as developed (or undeveloped) in the record, for two separate reasons.

First, the Award should be vacated because reinstating Grievant to his previous position—responsible for, inter alia, monitoring and maintaining residential building security—would violate fundamental public policy of workplace and resident safety and security by reinstating an habitually careless, negligent, and unremorseful employee to a position that has substantial and important safety and security responsibilities that the employee consistently ignored or shirked on a regular basis in the past.  Doing so would create serious safety and security issues for James Monroe and considerably increased exposure to significant liability—particularly in light of the uniquely challenging safety considerations it faces due to its location.  Mr. Reyes' blatant disregard of building safety protocols and documented policies and procedures of which he was well aware and are inherent in the nature of his position, put himself, other building employees working with him, and the buildings' residents at risk of harm, and the reinstatement of Mr. Reyes effectively reinstates those risks and dangers as well. Requiring the Board to wait until actual harm occurs before taking action to terminate Mr. Reyes' or

1

any other delinquent worker's employment flies in the face of public policy and common sense.  In light of these considerations, the remedy of reinstatement must be vacated.

Second, vacation of the Award also is warranted pursuant to <u>N.J.S.A.</u> 2A:24-8(c) because the Arbitrator refused to hear or consider evidence of Mr. Reyes' post-termination misconduct and security breach that, at the very least, was and is pertinent and material to the fashioning of the appropriate remedy even assuming, <u>arguendo</u>, James Monroe did not have "just cause" to discharge Mr. Reyes (as the Arbitrator determined).   Evidence of post-termination misconduct is well-recognized as a relevant consideration in deciding an appropriate remedy where the employer is found to have lacked the proper basis to support termination of employment.  Here, James Monroe attempted to introduce evidence showing Mr. Reyes' unauthorized (and possibly criminal) accessing of James Monroe's computer software system to send a building-wide e-mail blast to all of its residents disparaging the Board President within hours of his termination of employment, but the Arbitrator refused to allow the evidence because it related to something that happened after Mr. Reyes' termination letter already was issued.  As the issue presented to the Arbitrator was not just whether James Monroe had "just cause" to discharge Mr. Reyes, but also what is the appropriate remedy, the proffered post-termination evidence absolutely was and is material to the controversy, and the Arbitrator's failure or refusal to consider same requires the Award be vacated.

Lastly, the arbitration Award should be vacated and remanded to the Arbitrator for lack of finality and definiteness as to the implementation and calculation of damages owed arising from the Arbitrator's award of "full backpay."  It is well-settled that James Monroe is entitled to offset any interim income received by Mr. Reyes from alternative employment, unemployment compensation, or other sources against the award of backpay.  However, what that amount is in this particular case—if anything at all—cannot be ascertained unless and until the matter is remanded to the Arbitrator to receive evidence a develop a record reflecting any interim employment held by Mr. Reyes and any income earned from other sources during his period of unemployment from James Monroe.

Additionally, the question of mitigation of damages remains an open one that was not addressed by the Arbitrator previously, but must be considered upon a properly developed record before a definite and final award on all issues submitted to arbitration may be entered.

For these reasons, as set forth in greater detail below, the arbitration Award ordering reinstatement of Mr. Reyes with full backpay and benefits must be vacated and sent back to the Arbitrator.

## STATEMENT OF FACTS

In the interest of brevity, Plaintiff references and relies upon the facts and statements set forth in its Verified Complaint and accompanying exhibits, which Plaintiff hereby incorporates by reference herein.

## LEGAL ARGUMENT

## I.   STANDARD OF REVIEW

Although arbitration of labor-management disputes is favored and arbitration awards generally are entitled to judicial deference, that favor and deference is not without limitation.  Scotch Plains-Fanwood Bd. of Educ. v. Scotch Plans-Fanwood Educ. Ass'n, 139 N.J. 141, 149 (1995).  The reviewing court must not "simply [] 'rubber stamp' the interpretations and decisions of arbitrators." Metromedia Energy, Inc. v. Enserch Energy Servs., Inc., 409 F.3d 574, 579 (3d Cir. 2005) (quoting Matteson v. Ryder Sys. Inc., 99 F.3d 108, 113 (3d Cir. 1996)); see also Cty. Coll. of Morris Staff Ass'n. v. Cty. Coll. of Morris, 100 N.J. 383, 391 (1985) (recognizing limitations to deference given an arbitrator's decision and that there are various bases justifying judicial refusal to enforce same). This matter fits squarely within the statutory exception to the general rule respecting judicial review of arbitration awards.

A party to an arbitration of a collective bargaining agreement dispute may commence a summary action in the Superior Court to vacate, modify or correct an award.  See N.J.S.A. 2A:24-7.

Under N.J.S.A. 2A:24-8, a court *must* refuse to enforce and is *required* to vacate an arbitration award in a labor dispute under a collective bargaining agreement: (a) if it was procured by corruption, fraud or undue means; (b) if there was evident partiality by any of the arbitrators; (c) where the arbitrator(s) was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party; or (d) where the arbitrator(s) exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made (i.e., if the award deals with either more or less than the total number of issues submitted or otherwise lacks finality or definiteness). N.J.S.A. 2A:24-8. If any of these four statutorily-defined circumstances or situations is present, the court is *required* to vacate the award and may direct a rehearing by the arbitrator. Id.

In addition to the various grounds specified in the statute above requiring a reversal of the award in this case, an arbitration award also should be modified or vacated where, as here, the award is contrary to existing law or public policy. Borough of Glassboro v. Fraternal Order of Policy, Lodge No. 108, 197 N.J. 1, 10 (2008); N.J. Tpk. Auth. v. Local 196, I.F.P.T.E., 190 N.J. 283, 295 (2007); Tretina Printing v. Fitzpatrick & Assocs., 135 N.J. 349 (1994).

In this Case, the Opinion and Award must be vacated both because it is contrary to public policy as well as under subsections (c) and/or (d) of N.J.S.A. 2A:24-8 and must be vacated.

## II.   **The Arbitration Award Must Be Vacated Because It Violates and Runs Contrary to Existing Law or Public Policy.**

The Arbitrator's reinstatement of Mr. Reyes to his former position with James Monroe would violate public policy and, therefore, the Award should be vacated, in order to promote workplace and resident safety, well-being, and security with which workers in Mr. Reyes' former position are and must be trusted.

As noted above, a court may vacate or overturn an arbitration award in a labor dispute on

4

public policy grounds if it is contrary to or against existing law or public policy.  Borough of Glassboro, 197 N.J. at 10; N.J. Tpk. Auth., 190 N.J. at 294; Bd. of Educ. Of Borough of Alpha, Warren Cty. v. Alpha Educ. Ass'n, 188 N.J. 595, 603 (2006).  Indeed, it is well-settled that a court *must* intervene to prevent enforcement of an arbitration award that would violate a clear or obvious mandate of public policy.  Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420, 443 (1996); Telephone Workers Union of N.J., Local 827, Intern Broth. of Elec. Workers, AFL-CIO v. N.J. Bell Telephone Co., 450 F. Supp. 284, 291 (D.N.J. 1977) (court should decline to enforce an award insofar as it may conflict with statutory law or public policy), aff'd 584 F.2d 31 (3d Cir. 1978).  The public policy exception requires "heightened judicial scrutiny" when an arbitration award implicates "a clear mandate of public policy."  N.J. Tpk. Auth., 190 N.J. at 294.  For purposes of judicial review of labor arbitration awards, public policy sufficient to vacate an award may, but does not have to, be embodied in legislative enactments, administrative regulations, legal precedents, common law, or elsewhere; implementation of the award does *not* have to violate any positive law or proscription in order to be found to violate or run contrary to public policy.  Id. at 295; Exxon Corp. v. Local Union 877, Int'l Bhd. of Teamsters, 980 F. Supp. 752, 768 (D.N.J. 1997) ("a court need not find a violation of a specific rule [] or prohibition").  In such an instance, the Court is duty-bound "to provide an enhanced level of review of such arbitration awards . . . by a carefully scrutiny of the award . . . to verify that the interests and objectives to be served by the public policy are not frustrated and thwarted by the arbitral award."  Weiss, 143 N.J. at 443.

Thus, state and federal courts in this jurisdiction and throughout the country do not hesitate to vacate arbitral awards reinstating terminated employees as contrary to public policy where, as here, the employee's malperformance, misfeasance, offense(s), misconduct, or other harmful or potentially harmful conduct resulting in discharge posed a special risk or threat to the safety, well-being, or security of the general public or others at the workplace due to the nature of the employee's job, or otherwise undermined the public trust placed in individuals in such a position.  See, e.g., Exxon

5

Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357 (3d Cir.1993) (vacating reinstatement of seaman, charged with steering oil tanker, whose blood alcohol content was four times Coast Guard limit); Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d 1189, 1195-96 (3d Cir. 1993) (barring reinstatement of oil tanker employee found intoxicated on duty despite lack of direct legal prohibition); Iowa Elec. Light & Power v. Local Union 204, Int'l Bd. Of Elec. Workers, 834 F.2d 1424, 1430 (8th Cir. 1987) (refusing to reinstate nuclear power plant employee who committed safety violation); Chicago Fire Fighters Union Local No. 2 v. City of Chicago, 751 N.E.2d 1169 (Ill. App. 2001) (remanding matter concerning arbitral reinstatement of firefighters who responded to emergencies while inebriated); Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters, 969 F.2d 1436, 1442 (3d Cir. 1992) (finding arbitration award violated public policy when arbitrator reinstated employee accused of sexual harassment without determining whether harassment occurred). Where an individual performs his or her employment duties and, in doing so (or failing to do so properly), violates standards, restraints, and restrictions on conduct designed to ensure the safety and security of others, "a requirement that the employer suffer that malperformance and not discharge the offender does itself violate . . . public policy." Delta Air Lines, Inc. v. Air Line Pilots Ass'n. Int'l, 861 F.2d 665, 674 (11th Cir. 1988).

Plainly, workplace and public safety, as well as the prevention and minimization of threats thereto, constitutes a "well defined and dominant public policy" sufficient to vacate an arbitration award; this is especially true where an award of reinstatement violates a public policy which relates to the employee's job and which exists because the job itself makes the employee's conduct an immediate threat to the general public, such as where the employee holds a safety-sensitive position or a position charged with security-related tasks and responsibilities. See, e.g., G.B. Goldman Paper Co. v. United Paperworkers Int'l Union, Local 286, 957 F. Supp. 607, 620 (E.D. Pa. 1997); Amalgamated Meat Cutters v. Great Western Food Co., 712 F.2d 122, 125 (5th Cir. 1983); Liberty Mut. Ins. Co. v. Open MRI of Morris & Essex, L.P., 356 N.J. Super. 567, 581-85 (Law Div. 2002).

6

There can be no doubt here that the Arbitration Award reinstating Mr. Reyes violates public policy by preventing the Association from taking prompt action to address employee delinquencies that jeopardize workplace and resident safety and security.  Plainly, both management and the Board must be permitted to take whatever steps are necessary to ensure the safety, security, and well-being of its residents and facilities.  The Award should be vacated because reinstatement of Mr. Reyes would violate these accredited, well-defined, and dominant public policies given Mr. Reyes' documented history of negligence and carelessness in carrying out his job duties specifically designed to maintain the security and safety of the James Monroe residential building.  Additionally, reinstatement potentially exposes James Monroe to future liability, while also condoning reckless and irresponsible conduct and behavior which could endanger life or cause significant property damage.  Under the circumstances, failure to remove Mr. Reyes from what is, in essence, a safety-sensitive position charged with maintaining building-wide security would have been negligent, irresponsible, and contrary to James Monroe's legal obligation and duties to its residents.  Allowing the Arbitrator's Award of reinstatement in favor of Mr. Reyes to stand in this matter would establish a dangerous and unfortunate precedent whereby James Monroe will be inhibited from taking necessary action to protect the thousands of individuals who reside at the Premises and rely on the Board and management to protect them and keep them safe and secure in their homes.

The import of these policies is further heightened where, as here, children are involved.  See, e.g., Faherty v. Faherty, 97 N.J. 99 (1984) (recognizing firmly grounded public policy of protecting children from physical harm); State v. AFSCME, Council 4, Local 2663, 758 A.2d 387, 390-91 (Conn. App. 2000) ("That the protection and nurturing of children is an important public policy is almost too obvious for discussion."); Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361, 374 (6th Cir. 1998) ("We can imagine few governmental interests more important to a community than that of insuring the safety and security of its children"); Porter v. Ascension Parish School Bd.,

301 F. Supp. 2d 576, 588 (M.D. La. 2004) ("The safety of the children who attend our schools is one of the most important responsibilities school officials have.").  Here, when James Monroe conducted a video recording review of Mr. Reyes' work space over a six-week period, in addition to finding that he performed a bare minimum of his duties, spent excessive time preoccupied on his cell phone on social media and games, and many times left his workspace vacant and unguarded for extended periods without permission or coverage, Mr. Reyes was frequently observed allowing minor children to occupy his workspace and perform his duties, including lifting and moving large and heavy packages and other tasks where a child could be badly injured—significant risk exposure to the Association as well as the safety of the resident children in the building—as well as engaging in unknown activities while hiding from the camera with one child.  Under such circumstances, all of which the Arbitrator acknowledged did happen after he viewed the video recordings at the hearing, it is clear that reinstatement is especially contrary to public policy in that it would constitute a threat not only to the safety and security of residents generally, but perhaps even more so to the health and welfare of minor children and juveniles living in the building with whom Mr. Reyes engaged in questionable activities at the expense of tending fully and attentively to his job duties and responsibilities that included, among other things, monitoring building security cameras, screening and announcing visitors, and processing packages delivered to the Premises.

Mr. Reyes' misconduct and transgressions were and are too serious, pervasive, and flagrant to be tolerated, rife as was his carelessness, neglect, and lack of remorse, that if he is reinstated, would constitute a substantial threat to James Monroe's residents' security and the health and well-being of juveniles living in the building as well.  As such, reinstatement would fly in the face of public policy and, therefore, the Award should be vacated.

III.   **The Arbitration Award Must Be Vacated Because the Arbitrator Refused to Consider Pertinent, Material Evidence.**

Even if reinstatement would not run afoul of public policy as demonstrated above (it would), vacation of the Award still would be warranted, pursuant to N.J.S.A. 2A:24-8(c), as the Arbitrator erred in refusing to hear evidence that was pertinent and material to the controversy.  Specifically, James Monroe sought to introduce evidence showing that almost immediately after he received his termination notice on March 7, 2019, Mr. Reyes bypassed building security software to gain unauthorized access to the James Monroe e-mail system and send a building-wide e-mail to all of its residents that was inflammatory of Board President Padman Palani.  The Arbitrator, however, refused to allow the evidence because it related to something that happened after Mr. Reyes' employment had been terminated.  As the issue presented to the Arbitrator was not just whether James Monroe had "just cause" to discharge Mr. Reyes, but also what the appropriate remedy would be if it did not, the evidence proffered by James Monroe, which the Arbitrator failed or refused to accept into evidence and consider, was and is material to the controversy.  The Arbitrator's refusal to consider same requires that the Award be vacated.

Vacation of the Award also is warranted pursuant to N.J.S.A. 2A:24-8(c) because the Arbitrator refused to hear or consider evidence of Mr. Reyes' post-termination misconduct and security breach that, at the very least, was and is pertinent and material to the fashioning of the appropriate remedy even assuming, arguendo, that James Monroe did not have just cause to discharge Mr. Reyes in the first instance (as the Arbitrator determined).  As set forth below, evidence of post-termination misconduct is well-recognized as a relevant consideration in deciding an appropriate remedy where the employer is found to have lacked the proper basis to support termination of employment.

Even if, arguendo, Mr. Reyes' employment initially was terminated without just cause as the Arbitrator determined, and even if post-termination conduct by Mr. Reyes is immaterial to the question

9

whether James Monroe had just cause to terminate Mr. Reyes when it did on March 7, 2019, consideration of post-termination conduct still is relevant and pertinent to the second question— deciding the appropriate remedy and whether reinstatement is appropriate.  See, e.g., Ass'n of W. Pulp & Paper Workers, Local 78 v. Rexam Graphic, Inc., 221 F.3d 1085, 1089-90 (9th Cir. 2000) (explaining that post-termination conduct is properly taken into consideration in deciding appropriate remedy in labor dispute, even if employee was initially fired without proper cause, and holding arbitrator properly denied reinstatement of employee discharged without just cause, instead limiting employee award to backpay and benefits to the date of the hearing, based on the employee's post-termination conduct and untruths); United Food & Commer. Workers Union Local 1776 v. Excel Corp., 470 F.3d 143, 149 (3d Cir. 2006) (employee's post-discharge misconduct and actions must be considering in fashioning appropriate remedy where employee's termination was not supported by just cause); Columbus Show Case Co., 44 Lab. Arb. 507, 514 (1965) (Kates, Arb.) (arbitrator ruling that employee was terminated without just cause, but denying a portion of his backpay because of employee's post-discharge misconduct in swearing at supervisor); see also Paper, Allied-Indus., Chem. and Energy Workers Int'l Union v. S.D. Warren Co., 382 F. Supp. 2d 130, 142 (D. Me. 2005) (holding arbitrator did not exceed his powers when relying on post-discharge misconduct to deny back pay and reinstatement when there was nothing in the CBA that restricted his authority to do so).

Here, Mr. Reyes' conduct following his discharge was and is pertinent and material to evaluating and crafting the proper remedy if, as the Arbitrator determined, James Monroe's did not have just cause to terminate Mr. Reyes' employment when it did.  James Monroe should have been allowed to introduce such evidence for the arbitrator's review and consideration in the underlying arbitration, as it strongly militates against the remedy of reinstatement under the circumstances.  The Arbitrator's failure to do so constitutes reversible error and requires vacation of the Award under N.J.S.A. 2A:24-8(c).

10

**IV.**     **The Arbitration Award Must Be Vacated and Remanded to the Arbitrator for Further Proceedings Because It Lacks Finality and Definiteness as to the Calculation of Damages.**

Separate and apart from the question of reinstatement, the Court should vacate the Award and send the matter back to arbitration to determine and calculate the offset to which James Monroe is entitled for Mr. Reyes' interim income or earnings, if any, and for failure to mitigate his losses. Unless and until that happens, the Award will lack finality and definiteness, thus requiring vacation and remand pursuant to N.J.S.A. 2A:24-8(d).

Under New Jersey law (and elsewhere), an unlawfully discharged employee has a duty to mitigate damages by seeking substantially similar work; i.e., a terminated employee must mitigate his or her damages by obtaining alternative employment or introduce evidence a reasonable and diligent effort to find employment was made but did not lead to a comparable job. See, e.g., Goodman v. London Metals Exch., Inc., 86 N.J. 19, 34 (1981); Abrams v. Lightolier, 841 F. Supp. 584, 594 (D.N.J. 1994), aff'd, 50 F.3d 1204 (3d Cir. 1995). Accordingly, it is well-settled that a back pay award must be reduced by an employee's actual interim earnings as well as for losses "willfully incurred" by the employee who fails to exercise reasonable diligence to mitigate his or her damages (i.e., the amount he or she would have earned had he or she accepted an offer of part-time employment or made other reasonable efforts to mitigate). See, e.g., Goodman, 86 N.J. at 34-41 (1981) (employer may reduce its damages by showing employee has earned wages from other employment, or that employee could have secured other employment by reasonable efforts but did not); Sandler v. Lawn-A-Mat Chemical & Equipment Corp., 141 N.J. Super. 437, 455 (App. Div. 1976); Rogozinski v. Airstream by Angell, 152 N.J. Super. 133, 158 (Law Div. 1977); see also Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197-98 (1941) (back pay award awards under NLRA are subject to principles of mitigation and should be reduced by sums which workers "failed without excuse to earn"). Additionally, whatever amount an employee receives in unemployment benefits must be applied to offset against any wage award as well. See, e.g., Murray vs. Newark Hous. Auth., 311 N.J. Super. 163, 179 (Law Div. 1998) (citing

Goodman, 86 N.J. 19).  While failure to mitigate issues may be fact-sensitive, at the very least if a claimant who has been awarded backpay has actually obtained other employment or earned income from some other alternative source, the employer is entitled to a credit for the amount of those earnings as a setoff against damages owed.  Goodman, 86 N.J. at 41.

A terminated grievant's replacement of some of the income lost by virtue of his termination of employment certainly impacts the calculation of lost income due to the employee, and an offset of interim or replacement income from a back pay award is a constituent element of restoring the grievant to the financial position he would have occupied but for his discharge.  This is precisely the purpose of backpay in the labor and employment context, i.e., making employees whole by restoring them to the financial/economic position they would have enjoyed absent the adverse employment action.  Flagg v. City of Newark, No. A-0788-05T5, 2008 N.J. Super. Unpub. LEXIS 844, at *10 (App. Div. July 15, 2008) (citing Decker v. Bd. of Educ. of Elizabeth, 153 N.J. Super. 470, 475 (App. Div. 1977)); see also In re Galloway Twp. Bd. of Educ., 157 N.J. Super. 74, 83 (App. Div. 1978) (noting back pay orders in NLRB cases are designed to vindicate the public policy of the statute by making employees whole for losses suffered on account of an unfair labor practice).  The remedy is not intended to be punitive, and is not designed to put the grievant in a better position than he would have occupied absent the employer's conduct, or to provide the grievant a windfall.  See Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1100 (3d Cir. 1995).  Interim earnings and unemployment compensation, therefore, are to be deducted when backpay is awarded.

Thus, there can be little doubt that, at the very least, James Monroe is entitled to an offset of the backpay due Mr. Reyes for the income Mr. Reyes earned, if any, from alternative employment, unemployment compensation, and/or other sources while he remained unemployed by James Monroe following his discharge on March 7, 2019.  If Mr. Reyes earned any income from alternative employment, unemployment, or otherwise, he is not entitled to a windfall by recovering that amount from James Monroe as well.

12

Here, however, the record is devoid of any such information concerning Mr. Reyes' interim earnings and income, if any, from other sources, without which Plaintiff cannot calculate the payment due to Mr. Reyes to make him whole for his lost wages.  Plaintiff does not have any information as to whether Mr. Reyes found another job or earned income from any other source(s) during his period of unemployment from James Monroe.   Under such circumstances, it is appropriate and necessary for the Court to remand the matter to the Arbitrator to properly receive evidence in the first instance and develop a complete record as to Mr. Reyes' interim earnings and income for which James Monroe is entitled to an offset as a matter of law.  See, e.g., Tretina Printing, 135 N.J. at 362-64 (explaining that where, in a labor arbitration, an issue has not been submitted to nor decided by the arbitrator but is necessary for calculating the final determination, it is proper to remand that issue to the labor arbitrator); Amalgamated Transit Union, Local 1318 v. DeCamp Bus Lines, Inc., 382 N.J. Super. 418, 420-21 (Law Div. 2005) (remanding matter to arbitrator for calculation of back pay award to employee under arbitration award taking into consideration, inter alia, interim payments received by employee).

Further, as noted above, the damages Mr. Reyes is entitled to recover for backpay likewise must be reduced by the amount he *should* have been able to earn through other employment based on his duty to mitigate; that is, James Monroe is entitled to an offset for interim income *and* for failure to mitigate losses.  The issue of mitigation of damages must be referred back to the Arbitrator for arbitration thereof in the first instance.  That is, the question of whether Mr. Reyes was or was not mitigating his damages, or making a good faith effort to find comparable, alternative employment, must be submitted to the Arbitrator so that a full and proper record can be developed and the Arbitrator can rule on the issue as required under the CBA.  Until a full record is developed on these mitigation and setoff issues, it is impossible for James Monroe to determine the precise amount of back wages and benefits due under the Arbitrator's initial award of back pay.

13

These issues properly are raised on a timely motion to vacate where, as here, the issue was not addressed by the Arbitrator in the first instance.  Defenses of mitigation of damages and set off may be raised in a timely petition to correct or vacate the arbitrator's award within the statutory period to appeal the award; an employer may present mitigation or set-off evidence to modify or correct the award in such circumstances.  See, e.g., Riverside Sheriffs' Ass'n v. Cty. of Riverside, 2011 Cal. App. Unpub. LEXIS 6907, at *15 (Sept. 13, 2011); Int'l Union of Operating Eng'rs, Local No. 841 v. Murphy Co., 82 F.3d 185, 189-90 (7th Cir. 1996) (explaining that, in case where mitigation and offset were not raised at arbitration, "certainly once [defendant-employer] saw mitigation was not included as part of the 'reinstatement' and 'made whole' award, it should have moved to modify or correct the award within the three-month period"); Sheriff of Suffolk Cty. v. Jail Officers & Emples., 990 N.E.2d 1042, 1049-51 (Mass. 2013) (where employer failed to raise issue of mitigation or offset of damages before the arbitrator and arbitrator's award was silent on the issue, employer could raise issue so long as it was asserted in timely challenge to the award under ALM G.L. c. 150C, § 11, Massachusetts' analog to N.J.S.A. 2A:24-8 providing for judicial vacation of arbitration award pursuant to collective bargaining agreement).

Under such circumstances, the normal and appropriate course of action is for the Court to treat the award as ambiguous or incomplete and remand the dispute to the original arbitrator for clarification and further arbitration proceedings.  See, e.g., Health Prof'ls & Allied Employees, Local 5091 v. Bergen Reg'l Med. Ctr. L.P., C.A., No. 08-cv-1031, 2010 U.S. Dist. LEXIS 1460, *14 (D.N.J. Jan. 8, 2010) (remanding to original arbitrator because the portion of the award directing the grievant to be made whole for any lost wages and other benefits she would have received required more than a ministerial calculation); Tenet Healthsystem MCP, LLC v. Pa. Nurses Ass'n Local 712, No. 01-2201, 2001 U.S. Dist. LEXIS 21535, *16 (E.D. Pa. Dec. 20, 2001) (where arbitration award did not set forth the dollar amount of back pay to be paid to the grievant and the record did not contain any evidence or information as to the amount of income or interim earnings

14

the grievant received after his determination, reviewing court was required to "remand the matter to the arbitrator so that the amount due to the grievant may be definitely determined by arbitration"); Penn. Nurses Ass'n, Local 729 v. John F. Kennedy Med. Ctr., 247 F. Supp. 2d 665, 678 (E.D. Pa. 2003) (remanding "case to the arbitrator for clarification as to whether he considered the issue of mitigation in the Award and, if so, whether the nurses were required to mitigate their damages"). Here, given the lack of clarity and definiteness of the Arbitrator's Award, and that the Award itself is devoid of any reference or inclusion regarding mitigation of damages or offset, remand is the only proper remedy.

## CONCLUSION

For all the foregoing reasons, it is respectfully submitted that the Court should vacate the February 14, 2020 Award and remand the matter for re-arbitration as to the proper remedy as set forth above.

Respectfully submitted,

STARK & STARK
A Professional Corporation

By: ___/s/ Benjamin E. Widener_____
       BENJAMIN E. WIDENER

Dated: May 8, 2020

E
X
H
I
B
I
T

A

# EXHIBIT "A"

## OFFICE OF THE CONTRACT ARBITRATOR

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In the Matter of the Arbitration between
KYLE BRAGG, PRESIDENT, LOCAL 32BJ       Opinion and Award
SERVICE EMPLOYEES INTERNATIONAL UNION    Case No. 52510-19

        And

JAMES MONROE CONDOMINIUM
C/O FIRST SERVICE RESIDENTIAL
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**APPEARANCES:**

| | |
|---|---|
| For the Union: | Max Utzschneider, Esq. |
| For the Realty Advisory Board: | Stephen Ploscowe, Esq. |
| | Carlos Torrejon, Esq. |
| | Fox Rothschild LLP |
| Employee: | John Reyes, Grievant |
| Premises: | 45 River Drive South |
| | Jersey City, New Jersey |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     A dispute has arisen between James Monroe Condominium at Newport, Inc. c/o First Service Residential (the Employer) and Local 32BJ, Service Employees International Union (the Union) concerning Employee John Reyes (the Grievant) employed at 45 River Drive South, Jersey City, New Jersey (the Premises). The same was submitted to the Undersigned for arbitration and Award pursuant to the pertinent provisions of the Agreement between the parties at hearings held on October 29 and December 16, 2019 and January 16, 2020, after which the parties presented closing arguments and the Undersigned closed the record.

### Background

     The Employer is a Condominium in Jersey City, New Jersey that utilizes First Service Residential as its Managing Agent. Mr. Reyes was an employee at the Premises since 2012, most recently as a Concierge, in which position he was assigned to the Package Room. The Premises has ten employees, of whom five are Concierges.

In an August 20, 2019 letter to the Office of the Contract Arbitrator, the Union alleged the following complaint:

> Member claims states that he was unjustly discharged effective 3/07/2019.

### ISSUE[1]

The parties referred the following Issue to the Undersigned:

> Did the Employer have just cause to discharge John Reyes? If not, what shall be the remedy?

### Parties' Positions

Employer Position

The Employer reports that Mr. Reyes' performance as a Concierge was subpar for years, but, as the son of the long-term Superintendent, his performance was tolerated by prior management until new management replaced the former management. The Employer further reports that the new managers found that Mr. Reyes' performance had generated numerous complaints. When the Employer conducted a video recording review of Mr. Reyes' work space over a six week period, it reports it found that he performed a bare minimum of his duties and spent excessive time with his cell phone on social media and games, while also allowing minor children to share his work space and help him perform his duties, while neglecting his video monitoring duties, thereby creating serious safety and security issues for the Employer.

As a result of the Employer's review of Mr. Reyes' performance in the video recordings, the Employer terminated him for his negligence in a position that had important safety and security responsibilities that he had ignored. The Employer argues that continuing Mr. Reyes in his position - or restoring him to it - would expose it to a high level of liability because of the uniquely challenging safety considerations it faces due to its location, where it has experienced a number of alarming events, such as carjacking and thefts.

---

[1] The Undersigned is in receipt of a copy of a letter dated April 25, 2019 from David E. Leach III, Regional Director of Region 22, the Newark New Jersey Office of the National Labor Relations Board, regarding a charge under the National Labor Relations Act filed by Mr. Reyes with that Office in Case No. 22-CA-237980. In Mr. Leach's letter, he advises Mr. Reyes and the parties of his deferral of the allegations in the charges. The parties stipulated that the Undersigned decide only the just cause issue raised herein, not the statutory issue raised by Mr. Reyes under the National Labor Relations Act.

Union Position

The Union argues that Mr. Reyes has been an employee since 2012 and, until his March 7, 2019 termination, had a prior minor disciplinary history involving warnings and no suspensions; his termination came without explanation and was based upon four backdated Warnings from January and February 2019. Simply put, the Union argues, the Employer failed to progressively discipline Mr. Reyes after finding he had engaged in only minor violations involving cell phone use and a lateness. The Union argues that failing to progressively discipline Mr. Reyes deprived him of an opportunity to conform to the Employer's expectations.

In addition, the Union notes the context makes the Employer's decision to terminate suspicious in that a Department of Labor (DOL) investigation was underway and Mr. Reyes could have been seen to be a part of the investigation.

However, the Union notes, it relies upon the Employer's failure to progressively discipline Mr. Reyes to support its argument that the Employer did not have just cause for his termination and seeks his reinstatement and full backpay and benefits for him.

### Evidence

Witnesses

In support of the Employer's contentions, it presented First Service Residential Acting Property Manager Dyllon Galler and its Board President Padmanabhan Palani as its witnesses. In support of the Union's contentions, it presented Mr. Reyes as its witness.[2]

The Employer also presented Mr. Palani as a rebuttal witness and the Union presented Mr. Reyes as a rebuttal witness.

Employer Witnesses

First Service Residential Acting Property Manager Dyllon Galler

Mr. Galler testified that he became the Acting Property Manager at the Premises in August of 2018 on behalf of First Service Residential, which had been the managing agent at the Employer since 2017.

---

[2] The Union also offered testimony from a resident, Celeste Del Gatto.

Mr. Galler testified that the Premises has had security issues, as evidenced by a number of incidents it experienced since Mr. Reyes' termination involving an attempted theft of materials, a carjacking, and an attempted ingress by a stranger.[3] Mr. Galler further testified that the Employer does not employ security guards; rather, the Concierges have responsibility for screening and announcing visitors and processing packages delivered to the Premises.

Mr. Galler testified that Mr. Reyes was a careless employee who did not act in compliance with the Employer's procedures as to such duties that were set forth in Employer Exhibits Nos. 3,[4] 4[5] and 5,[6] each of which Mr. Galler testified, he found among the Employer's business records when he arrived at the Premises. Mr. Galler further testified that, with First Service Residential Community Manager Lou Capurso, he spoke in December 2018 with Mr. Reyes about his shortcomings and resident complaints about his performance; Mr. Reyes responded ok, he was going to the Union and the complaints continued.

Mr. Galler then testified that on March 6-7, 2019, Mr. Capurso and he conducted a review of video recordings of Mr. Reyes' work station in the Package Room. At the conclusion of their review, Mr. Galler compiled a description of Mr. Reyes' violations that Mr. Capurso and he had viewed on the recordings. Employer Exhibits Nos. 6A-D, four Employee Warning Notices re: January 21, February 4, 18 and 24, 2019 that recite eight instances of Violations involving Security, Absence, Substandard Work and Carelessness. Events described and viewed at the hearing herein involved Mr. Reyes returning an extra 20 minutes late from a 30 minute break; receiving packages while on facetime; while on facetime, allowing a resident to pick up his own package; being of facetime; being on phone while using Keylink to provide a key to a resident; having headphones on while serving a resident; playing video games with a juvenile resident; allowing the juvenile resident to remove a package; while playing video game with the juvenile resident, and permitting a delivery person to proceed without taking identification. Mr. Galler testified that other footage showed additional Violations.

Mr. Galler next testified that he reviewed Mr. Reyes' file and found Employer Exhibits Nos. 8A-C, three Employee Warning Notices from: September 13, 2016, January 30, 2017 and

[3] Employer Exhibits Nos. 1 and 2
[4] Security Memorandum (Undated)
[5] Concierge/Package Room Service June 5, 2017
[6] Front Desk Manual Amended 02.07.2010

Page 4 of 16

December 4, 2017 involving Security, Absence, Substandard Work and Carelessness. Events described involved September 13, 2016 leaving the front desk unattended; January 30, 2017 involving allowing a toddler inside the Package Room; and December 4, 2017 involving leaving the front desk, including while speaking with a resident for ten minutes while away from his post.

Mr. Galler next testified that the matters raised by these Warnings showed an egregious and ongoing disregard for resident security; as a result, on March 6, 2019, Mr. Capurso and he recommended termination of Mr. Reyes to the Employer's Board.

On cross examination, Mr. Galler testified that he did not issue any discipline after the December 2018 meeting with Mr. Reyes and could not recall any of the resident complaints he called to Mr. Reyes' attention; he also testified that had no additional discussions with Mr. Reyes about Mr. Reyes' performance thereafter, before Mr. Galler recommended termination to the Board. Mr. Galler testified he first provided Mr. Reyes with the Employer Warnings regarding the video review at the same time that he gave Mr. Reyes his termination letter on March 7.

Mr. Galler also testified that he did not conduct a video review of any other employee before his review of Mr. Reyes and that he could not recall the names of any resident from whom he had received a complaint about Mr. Reyes. Mr. Galler acknowledged that he could not say for certain that he had ever seen Employer Exhibit No 5, the Front Desk Manual Amended 02.07.2010, at either of the two locations at which it was supposed to be kept: the Front Desk and the Package Room. Mr. Galler also acknowledged that portions of the video recordings included time periods in which Mr. Reyes was properly viewing the security monitor and that no security breach or mishandled package arose out of the time periods involved in the video recordings.

Board President Padmanabhan Palani

Mr. Palani, Board President for eight years and previously Treasurer for two years, testified that the Board switched to a new management company for improved security and offered as an example of his concern Employer Exhibit No. 9, a memo dated July 21, 2018 to residents that he wrote and issued regarding a security issue involving a resident assisted by a Concierge and follow up actions the Board was taking. As to Employer Exhibits Nos. 3 and 4, Mr. Palani testified he had been involved in their distribution to the Front Desk and the Package Room, but he did not know whether Mr. Reyes had gotten them. Mr. Palani also testified as to seeing Mr. Reyes away

from his desk, such as near an elevator, and seeing him many times with juveniles in his Package Room, about which Mr. Palani spoke with management.

Mr. Palani testified that he first knew of and received the recommendation to terminate Mr. Reyes from Mr. Capurso in an email sent 4:23 pm on March 6, 2019 (Employer Exhibit No. 10); Mr. Palani forwarded it to his fellow Board members at 6:57 pm, advising them that he wanted each member "to vote by tomorrow morning as we need to move on," and further advising (March 7 at 8:03 am) that they should vote by Noon, as "Management has to prepare and issue the letter by 2 PM." The next morning and afternoon, all the Board members voted for termination, the last at 2:49 pm. During that period, Mr. Palani testified, all the Board members viewed not only all the video recordings cited by Mr. Capurso in his recommendation memo, but also other videos, to ensure the Board was dealing fairly with Mr. Reyes. Mr. Palani testified, and reviewed the recordings at the hearing herein, as to his and the other Board members' viewing of additional January 27 and February 11, 2019 video recordings in which, for example, Mr. Reyes failed to assist a resident while using his cell phone and continued to use the phone for extended periods; joined with a juvenile resident in playing video games; permitted the juvenile to handle packages and provide them to residents; additionally played video games, engaged in call phone usage, ignored residents and/or assisted them while impeded by his cell phone usage; and failed to view security monitors.

On cross examination, Mr. Palani testified that he was not present when Mr. Reyes was given Employer Exhibits 8A-C, but was told of each delivery to him before and after they were given to him by then-management officials. Mr. Palani acknowledged that none was signed by Mr. Reyes, but noted one, 8C, dated December 4, 2017, had his comments, which disputed the write up.

Mr. Palani further testified that he first learned of Mr. Capurso and Mr. Galler's investigation when he received Mr. Capurso's 4:23 pm March 6, 2019 email; by midnight, Mr. Palani testified, he had reviewed not only the recordings cited by Mr. Capurso and those Mr. Palani reviewed at the hearing, but numerous others, via skipping through them; he reported he wanted to be fair to Mr. Reyes, but even if the additional videos had shown better work by Mr. Reyes, which they did not, the videos cited by Mr. Capurso would have been sufficient to warrant termination, in Mr. Palani's view.

Mr. Palani further testified that a specific incident involving Mr. Reyes that prompted the investigation was that a resident had reported that an individual had knocked on his door with packages without the resident receiving a call in advance; when asked, Mr. Palani testified he did not know why it had not been mentioned by him or Mr. Capurso in their emails.

Mr. Palani testified that the rear door that was viewed on the two security monitors in the Package Room was kept locked; he also acknowledged that the monitors sometimes malfunctioned.

Mr. Palani further acknowledged that he knew of no security breach or mishandled package that arose out of the time periods involved in the video recordings he viewed. As to the juvenile, Mr. Palani testified that the Board did not deal with the parents about such; rather, the Board issued instructions to its employees regarding such matters.

Mr. Palani also acknowledged the Employer's prior tolerance of Mr. Reyes' conduct due to his father's presence as a revered Superintendent, but testified that it was demoralizing to Mr. Reyes' fellow employees to view him flouting rules that they were required to follow and the Board believed that it had a responsibility to recognize the issue and show that it had consequences.

Lastly, Mr. Palani testified that the Board had never before viewed extra videos to the extent that it had with Mr. Reyes.

<u>Union Witness</u>

John Reyes

Mr. Reyes testified that he started at the Employer as a Porter in 2012 and became a Concierge in 2015, after which he received no training other than observing fellow Concierge Biddy Valdez perform his work.

Mr. Reyes testified that prior to the hearing herein, he had not previously seen any of Employer Exhibits Nos. 3, 4, 5, 8A, 8B, 8C or 9. As to 8C, Mr. Reyes testified he had been told by his Supervisor, his father Juan Reyes, to prepare a statement about an accusation he had left the front desk, which he did; Mr. Reyes was uncertain whether Juan Reyes made the entry that appeared on Employer Exhibit No. 8C. In any event, Mr. Reyes testified that he recalled that he was guiding residents toward filling available elevators during a disrupted elevator situation at the

Premises when Mr. Palani came along and said to Mr. Reyes that he had left the front desk. Mr. Reyes testified that he had never been given any coachings or warnings or discipline or suspensions over that incident - or any other matter - during his employment.

As to the December 2018 meeting described by Mr. Gallen in his testimony, Mr. Reyes testified it had not taken place. Mr. Reyes testified that he was not aware of any resident complaints about him.

Mr. Reyes testified that prior to his March 7, 2019 termination, he knew nothing about the Warnings - or their subject matters - that were attached to his termination letter.

Mr. Reyes testified that cell phones were regularly used by him and other employees for Keylink and for work calls among themselves and with residents. In addition, Mr. Reyes testified, he and other employees regularly used cell phones for personal matters, including entertainment and bill paying, etc., and he did not believe it ever interfered with his performance of his duties, Mr. Reyes testified he had never been told of any restriction on cell phone use by his Employer.

As to the juveniles with whom Mr. Reyes spent time in the Package Room, he testified that he thought it was acceptable because juveniles regularly spent time with Concierges during work time and he had never been instructed not to do so.

In the Package Room, Mr. Reyes testified, residents would approach him not only to obtain packages, but also to ask questions, which explained the reason that a resident who walked into the Package Room would have walked away without getting a package.

As for deliveries at the back door to a resident, Mr. Reyes testified that the procedure was for him to call the Front Desk to confirm with the resident; when confirmed, the delivery person was allowed to enter and proceed to the resident's floor.

As to a Department of Labor (DOL) investigation at the Employer, Mr. Reyes testified that he initiated it on his own and other employees' behalves; the outcome was that his father, Juan Reyes, was found to be owed $18,000 in overtime. Mr. Reyes expressed his belief that the Employer felt it could not discharge Juan Reyes, so it took out its unhappiness about the DOL investigation and its results on Mr. Reyes.

On cross examination, Mr. Reyes testified that if the Employer chose to tell employees they could not spend time on facetime, it could have done so, but all employees did so when he worked there. In addition, all employees regularly extensively interacted with juveniles while on duty, as he did.

As to Employer Exhibit No. 8C, Mr. Reyes testified that at the time three elevators were down; on further review, Mr. Reyes acknowledged that the writing on 8C was his.

As to the DOL investigation, Mr. Reyes testified he believed Mr. Capurso was aware of Mr. Reyes' role, because he probably must have heard.

Employer Rebuttal Witness

Padmanabhan Palani

Mr. Palani testified that he was the person who complained re: Mr. Reyes' absence from the Front Desk: he had observed Mr. Reyes engaged in conversation with a resident for over ten minutes after leaving the Front Desk uncovered and told Mr. Reyes to go back to the Front Desk; as to whether elevators were down, Mr. Palani submitted documents that he reported established that the Employer's elevator service did not bill it for emergency repairs in December 2017, the month of Employer Exhibit No. 8C.

As to the DOL investigation, Mr. Palani testified that that he had handled it and that he had no idea whether Mr. Reyes had initiated it. As for the investigation's outcome, it is under appeal by the Employer.

Union Rebuttal Witness

John Reyes

Mr. Reyes testified that in December 2017, an elevator was down due to a missing part and a second elevator was also down, leading to regular lines for elevators that he was guiding.

**Parties' Positions**

Union Position

The Union contends that the Employer did not have just cause to discharge an employee, especially a long-term employee, without a record of prior progressive discipline of warnings,

verbal and written, and pre-termination suspension or suspensions, as appropriate. In addition, the Union argues, an employee must be given notice of an employer's rules and the reason an employee is seen to be in violation of those rules. Further, an employer must consistently enforce its rules. The Union argues also that an employee cannot be terminated for the first instance of a violation of a rule about which he or she has not been notified. Termination is solely a last step in the progressive discipline system, used only after an employee has not responded to all the preceding steps with the improved performance required by the employer. And unenforced rules cannot be applied until employees are notified of the rules and their upcoming enforcement, with notice of the consequences of non-compliance.

The Union argues that the Employer herein failed to provide any element of progressive discipline when terminating Mr. Reyes. The Employer failed to offer evidence that any of its asserted rules and Handbook were ever provided to or signed for by Mr. Reyes or that he received any training, other than what he saw other employees doing. Therefore, the Union argues, the lack of evidence of notice to Mr. Reyes supports his testimony that he was not told of any of the rules the Employer seeks to enforce with is termination. Nor has the Employer shown that it has enforced any of the rules it says it has. For example, Mr. Palani himself, the President of the Board for multiple years, testified he saw Mr. Reyes with juveniles in the Package Room and complained to management. Nonetheless, the Employer offers no evidence that the concern was ever communicated to Mr. Reyes. Yet, Mr. Reyes was terminated for doing something he saw other employees also doing.

In sum, the Union asserts, Mr. Reyes received no notice of a rule the Employer did not enforce and he had to be terminated because, Mr. Palani explained, Mr. Reyes was demoralizing his fellow employees by flouting rules they were required to follow and as a result, the Board had to show that such conduct had consequences.

The Union also argues that the origin of the Employer's decision to terminate Mr. Reyes is suspect in that it is also unclear what reason caused Mr. Reyes to be singled out for the video review. No security breach or lost packages or resident complaint or non-performance of duties or interference with job performance was advanced by the Employer as the reason for suddenly spending many hours viewing video recordings of Mr. Reyes at his job. Moreover, the Employer resorted to Employee Warning Notices, two of which Mr. Reyes states he did not receive - and

which are also poorly supported in their lack of signatures - as well as a totally undocumented alleged meeting with Mr. Reyes in December 2018 that Mr. Reyes says never happened. In addition, the Union notes, the Employee Warning Notices state that if the conduct is repeated, a written warning and suspension and termination may follow, i.e., the Employer would adhere to progressive disciplinary standards.

In sum, the Union argues that the Employer blatantly disregarded progressive discipline and Mr. Reyes should be reinstated with full backpay and benefits.

Employer Position

The Employer contends that Mr. Reyes' workplace behavior demonstrated an irresponsible lack of caring for his job that he justified with his self-serving untruthful references to others' conduct while he counted on the Employer's regard for his father to carry on as usual. However, following complaints by residents, the Employer changed its management company and the new company conducted a video review of Mr. Reyes' workplace behavior and found malfeasance. The Employer argues that it does not have to await the actual harm of a security breach or lost packages to correct practices that it reasonably believes could lead to such outcomes.

As for progressive discipline, the Employer argues that what it found on the video recordings showed Mr. Reyes not doing his tasks and spending his time doing things such as facetime, which he knows not to do, as well as sending a juvenile to pick packages for him, thereby jeopardizing the juvenile. In addition, the Employer argues, the recordings showed Mr. Reyes not watching security monitors, causing a security breach in a building with strong major security concerns. Mr. Reyes, with his careless and self-interested attitude, has shown that he cannot be relied upon to provide the essential function of ensuring security for the building, the Employer argues. And Mr. Reyes' unremorseful rationalization of his conduct by saying he never got any rules and that others do the same is ridiculous, the Employer further argues. Rather than Mr. Reyes' pointing to the DOL investigation, which preceded his termination by many months, the Employer points to his neglectful and thoughtless behavior.

In sum, the Employer argues, Mr. Reyes was a very poor employee with prior discipline who was not doing his work and was jeopardizing a juvenile and the safety of the building's residents, making himself a liability to the Employer in that he, unremorseful, could not be relied

upon. Therefore, the Employer argues, it should not be forced to suffer the consequences of having an employee such as Mr. Reyes, who has engaged in conduct that is too serious and pervasive to be tolerated, and instead must be terminated.

## ANALYSIS

The Undersigned has presented thoroughly the parties' reports as to the video recordings that were viewed extensively over two days of hearings; he has as well carefully reviewed the recordings anew.

The Undersigned has also carefully considered the Employer's additional evidence and testimony, and its arguments as to its belief that progressive discipline was not required of it when it terminated Mr. Reyes on March 7, 2019. As argued by the Employer: Mr. Reyes was a very poor employee with prior discipline who was not doing his work and was jeopardizing a juvenile and the safety of the building's residents, making himself a liability to the Employer in that he, unremorseful, could not be relied upon. The Employer argues that, therefore, it should not be forced to suffer the consequences of having such an employee, whose conduct is too serious and pervasive to be tolerated.

The Union argues that the Employer blatantly disregarded progressive discipline in summarily terminating a long-term employee with only minor prior discipline, and it did so under suspect circumstances.

## Determination

The Undersigned finds that Mr. Reyes' actions depicted on the video recordings do not rise to the level of conduct that must be dealt with by summary termination rather than progressive discipline. Rather, Mr. Reyes' conduct consisted of a number of actions, as to any one or all of which in toto, if the Employer believed they constituted misconduct and/or lack of full performance, could be corrected through training, counselling and other steps that, if not successful, could be followed by a sequence of warnings, verbal and/or written; suspension or suspensions of varying lengths, as appropriate; and ultimately termination, in the event the misconduct or poor performance is not corrected.

## Discussion

While the Employer argues that Mr. Reyes' conduct is too serious and pervasive to be tolerated, rife as it is with his carelessness, neglect and lack of remorse, and that it constitutes a threat to its residents' security and the health of juveniles, the Undersigned finds that the actions in which Mr. Reyes engaged on the recordings do not constitute the types of conduct that are typically considered to warrant summary termination instead of progressive discipline. In that regard, the Undersigned notes that summary termination is ordinarily reserved for conduct such as violence or threats of violence; theft; dishonesty; disloyalty to an employer's interests, such as revealing trade secrets; etc. The Undersigned finds that not one action by Mr. Reyes in the recordings involved conduct that could be considered to totally corrode the Employer's trust in him or be so far outside the bounds of acceptable conduct by an employee that it manifestly constituted summary just cause for termination.

Rather, the actions of Mr. Reyes depicted on the recordings are typical of those that are readily remediable with an employer's notice of the need to do so. And while the Employer urges that it need not be forced to tolerate an employee's poor performance when it leaves it at risk of damage until it suffers the damage, a principle with which the Undersigned fully agrees, it is also true that every employee that makes a mistake or error that is correctable, even if it could subject an employer to damage, does not thereby become an employee subject to summary termination. Rather, that employee is subject to not only correction, but also to only the appropriate level of discipline for such mistake or error, in the context of his or her prior tenure and record.

The Undersigned further notes that the record evidence has also established that the Employer knew of much of Mr. Reyes' conduct depicted in the recordings for extended periods without previously making significant efforts to correct it. The Undersigned also notes the fact that the recordings demonstrate that Mr. Reyes clearly engaged in the conduct in an open manner, demonstrating that he had nothing he felt he had to hide about that conduct, in which, the recordings show, he routinely engaged in the presence of others.

In those regards, the Undersigned next notes the Employer's assertion that after receiving many resident complaints about Mr. Reyes, it brought in a new managing agent in 2017 to deal with them after its prior tolerance of Mr. Reyes' poor conduct and performance, due to his father's status at the Employer. Yet, since the arrival of its new managing agent in 2017, the Employer

offered a single document, Employer Exhibit No. 8C, in support of its efforts to deal with Mr. Reyes' poor performance, which Mr. Palani testified he himself initiated, and which Mr. Reyes disputed - and for which he was not disciplined further.  Otherwise, the Employer did not offer documentation of any other complaint about Mr. Reyes' performance or conduct, including by a resident, whether submitted by the resident or that the Employer prepared to memorialize a resident's verbal complaint - or of an Employer investigation of the complaint after it was received.

The Undersigned next notes Mr. Gellar's testimony that in December 2018, Mr. Gaspuro and he had a meeting with Mr. Reyes about resident complaints about him, a meeting that Mr. Reyes denies occurred - and regarding which the Employer offered no documentation thereof or of its subjects, including the resident complaints that Mr. Gellar testified were its subject. Furthermore, in Mr. Gellar's testimony on cross examination, he was unable to recall any of the resident complaints that he testified he discussed with Mr. Reyes at that meeting.  Accordingly, the Undersigned places no evidentiary weight upon the alleged meeting.

The Undersigned also notes - as an example of the Employer's long-standing tolerance of what it suddenly decided was summarily terminable conduct - the testimony by Mr. Palani, a long-term Board member and President for several years before 2019, that many times, for years, he had complained to management about Mr. Reyes having a juvenile in his Package Room.  Yet, even with the newly selected new management company as of 2017, and Mr. Galler arriving at the Employer in August of 2018, the Employer offered no testimony or documentation about what it had done since 2017 to resolve its concern about the juvenile's presence in the Package Room with Mr. Reyes.  Thus, neither Mr. Gellar nor Mr. Palani offered testimony as to even a visit either had made to the Package Room to discuss with Mr. Reyes the Employer's concern about the appropriateness of the juvenile being there with Mr. Reyes.

It is in that context that the Undersigned next notes that the Employer reports that, based upon continuing resident complaints - similarly completely undocumented - Mr. Gaspuro and Mr. Galler recognized on March 6, 2019 their need to watch many hours of video recordings of Mr. Reyes at his work station in the Package Room, spend considerable time writing up Mr. Reyes' actions thereon, and recommend termination.  Then, although Mr. Palani testified that his receipt of Mr. Gaspuro's email on March 6 at 4:23 pm was the first he knew of an investigation by Mr. Gaspuro and Mr. Gellar, and their recommendation that Mr. Reyes be terminated, Mr. Palani

further testified that at 6:57 pm he gave his fellow Board members until the following morning to view all the videos themselves and vote on the recommendation, because "Management has to prepare and issue the letter by 2 PM," a deadline for which the Employer offered no explanation.

On these bases, the Undersigned concludes that the record evidence offers no explanation for the Employer's March 6-7, 2019 rush to a judgment that Mr. Reyes should be immediately and summarily discharged, rendering the decision subject to concern about its true origins, especially in the absence of documentation of its asserted genesis: resident complaints. As a result, the Undersigned finds that the Employer's assertion that it had to terminate Mr. Reyes immediately on March 7, 2019 because of the threat he posed to the residents' security and to a juvenile, after years of tolerating his conduct and performance without making efforts to correct it, transparently suspect.

In that context, the Undersigned finds, it becomes doubly clear that the record evidence has established that the Employer was not required to deal with the shortcomings it believed it saw in Mr. Reyes' conduct and performance on the video recordings by terminating him immediately and summarily on March 7, 2019. Rather, the Undersigned finds, as discussed in greater detail earlier, the Employer was required to start a traditional program of resolving its concerns with notice thereof to Mr. Reyes, which, if necessary, could conclude with progressive discipline if its efforts failed and Mr. Reyes was unresponsive to its concerns.

## Conclusion

On all these bases, the Undersigned finds that the Employer did not follow the regular course of discipline under just cause principles when it summarily terminated Mr. Reyes on March 7, 2019. Therefore, the Employer did not have just cause to terminate Mr. Reyes and he should be reinstated with full backpay and benefits.

## AWARD

The Employer did not have just cause to discharge John Reyes on March 7, 2019.

The Employer shall immediately reinstate Mr. Reyes to his former position with full backpay and benefits.

The Undersigned shall maintain jurisdiction over this matter for purposes of resolving any disputes between the parties regarding the implementation of this Award.


DATE:        February 14, 2020            _____
                                          GARY KENDELLEN
                                          Contract Arbitrator


STATE OF NEW JERSEY:
                        SS:
COUNTY OF UNION:

I hereby affirm pursuant to CPLR Sec. 7507 that I am the individual described in and who executed this instrument, which is my Award.


DATE:        February 14, 2020            _____
                                          GARY KENDELLEN
                                          Contract Arbitrator

# E X H I B I T   B

# EXHIBIT "B"

JT #I

**COLLECTIVE BARGAINING AGREEMENT**

**-between-**

**JAMES MONROE CONDOMINIUM AT NEWPORT, INC.**

**-and-**

**SEIU LOCAL 32BJ**

**EFFECTIVE JANUARY 1, 2016 THROUGH DECEMBER 31, 2019**

41573329

# TABLE OF CONTENTS

**Page**

ARTICLE 1 - UNION RECOGNITION AND UNION SECURITY ............................................ 1

ARTICLE 2 – CHECK-OFF ............................................................................................. 1

ARTICLE 3 - HOURS OF WORK AND OVERTIME ........................................................ 2

ARTICLE 4 - VACATIONS ............................................................................................. 3

ARTICLE 5 - HOLIDAYS ............................................................................................... 4

ARTICLE 6 – FORCE REDUCTION ............................................................................... 5

ARTICLE 7 - SENIORITY ............................................................................................... 5

ARTICLE 8 – TRANSFERS ............................................................................................ 6

ARTICLE 9 - SAFETY AND HEALTH ........................................................................... 6

ARTICLE 10 - VISITATION ........................................................................................... 7

ARTICLE 11 - WAGES .................................................................................................. 7

ARTICLE 12 – MANAGEMENT RIGHTS ...................................................................... 8

ARTICLE 13 - DISCHARGES ........................................................................................ 9

ARTICLE 14 – GRIEVANCE PROCEDURE AND ARBITRATION .................................. 9

ARTICLE 15 – MILITARY SERVICE ............................................................................. 10

ARTICLE 16 – WELFARE PLAN ................................................................................... 10

ARTICLE 17 – MISCELLANEOUS WORKING CONDITIONS ........................................ 11

ARTICLE 18 – STRIKES AND LOCKOUTS ................................................................... 13

ARTICLE 19 – TRAINING FUND .................................................................................. 13

ARTICLE 20 – PENSION FUND .................................................................................... 13

ARTICLE 21 - TERMS APPLICABLE TO ALL BENEFIT FUNDS ................................... 15

ARTICLE 22 - DURATION OF AGREEMENT ................................................................ 15

i

41573329

This Agreement, effective January 1, 2016, by and between **JAMES MONROE CONDOMINIUM AT NEWPORT, INC.**, Jersey City, New Jersey, party of the first part (hereinafter designated as the "Employee"), and **SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32BJ**, with its principal place of business at 25 West 18th Street, New York, New York, 10011 (hereinafter designated as the "Union"), party of the second part.

## W I T E S S E T H:

**WHEREAS**, the parties hereto collectively bargained to promote and improve industrial and economic relations between the Employer and the employees and to set forth herein the Agreement covering rates of pay, hours of work and conditions of employment to be observed by the parties hereto:

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter entered into for other good and valuable consideration; the parties hereto agree to the following:

## ARTICLE 1 - UNION RECOGNITION AND UNION SECURITY

Section 1.    The Employer recognizes the Union as the exclusive bargaining representative for all porters, handymen, doormen and maintenance and concierge employees employed at The James Monroe Condominium at Newport in Jersey City, New Jersey, excluding office and clerical employees, supervisors, building manager, lifeguards, painters, appliance repairman and outside repairmen.

Section 2.    It shall be a condition of employment that all employees covered by this Agreement shall become and remain members in the Union on the thirty-first day following the beginning of employment or the date of execution of this Agreement, whichever is later. The requirement of membership under this Section is satisfied by the payment of the financial obligations of the Union's initiation fee and periodic dues uniformly imposed.

Upon receipt by the Employer of a letter from the Union's Secretary-Treasurer requesting an employee's discharge because s/he has not met the requirements of this section, unless the Employer questions the propriety of doing so, the employee shall be discharged within fifteen (15) days of the letter if prior thereto the employee does not take proper steps to meet the requirements. If the Employer questions the propriety of the discharge, the Employer shall immediately submit the matter to arbitration under this Agreement. If the Arbitrator determines that the employee has not complied with the requirements of this section, the employee shall be discharged within ten (10) days after written notice of the determination has been given to the Employer.

## ARTICLE 2 – CHECK-OFF

Section 1.    The Employer agrees to deduct monthly dues, initiation fees, American Dream Fund, or Political Action Fund contributions from the wages of an employee when authorized by the employee in writing in accordance with applicable law. The Union will furnish the necessary authorization forms to the Employer.

41573329

If the Employer fails to deduct or remit to the Union the dues or other monies in accordance with this section by the twentieth (20th) day of the month, the Employer shall pay interest on such dues, initiation fees, or contributions at the rate of one (1%) percent per month beginning on the twenty-first (21st) day, unless the Employer can demonstrate the delay was for good cause due to circumstances beyond its control.

If an employee does not revoke his or her dues check-off authorization at the end of the year following the date of authorization, or at the end of the current contract, whichever is earlier, the employee shall be deemed to have renewed his or her authorization for another year, or until the expiration of the next succeeding contract, whichever is earlier.

Section 2.    In making the deductions and transmittals as above specified, the Employer shall rely upon the most recent communication from the Union as to the rate of regular monthly dues and the proper amount of initiation fees.

## ARTICLE 3 - HOURS OF WORK AND OVERTIME

Section 1.    The workweek shall be comprised of five (5) days of eight and one-half (8½) hours each, which shall include a one-half (½) hour non-paid lunch.

Section 2.    All hours worked in excess of forty (40) hours in any one (1) week, or eight (8) hours (exclusive of lunch) in any work day shall be paid for at the rate of one and one-half (1½ x) times the employee's regular hourly rate.

Section 3.    Paid holidays under Article 5 shall be computed as time worked for the calculation of overtime pay.

Section 4.    Employees shall be scheduled on eight and one-half (8½) hour shifts and shall be entitled to not less than one-half (½) hour non-paid lunch time in accordance with posted schedules at such reasonable times as may be determined by the Employer. Employees assigned as doorman or concierge shall be scheduled for eight (8) hours and shall eat their lunch during their shift.

Section 5.    If any employee shall work on other than a scheduled working day, he shall be paid at the regular hourly rate but such time worked shall be included in determining the hours worked in any one (1) week.

Section 6.    Doormen and concierge shall request permission from their supervisor at any time it becomes necessary to leave their workstation.

Section 7.    Each member of the bargaining unit shall work a fair and reasonable amount of overtime to be offered in rotation by seniority.

## ARTICLE 4 - VACATIONS

<u>Section 1.</u>     A vacation will be granted to all regular employees who have been in the service of the Employer and have worked the minimum required regular working hours to qualify for vacation pay in accordance with the following schedule:

| PERIOD OF EMPLOYMENT | VACATION ACCRUED |
|---|---|
| 1 Year | 5 Working Days |
| 2 Years | 10 Working Days |
| 6 Years | 11 Working Days |
| 7 Years | 12 Working Days |
| 8 Years | 13 Working Days |
| 9 Years | 14 Working Days |
| 10 Years | 15 Working Days |
| 21 Years | 16 Working Days |
| 22 Years | 17 Working Days |
| 23 Years | 18 Working Days |
| 24 Years | 19 Working Days |
| 25 Years | 20 Working Days |

<u>Section 2.</u>     (a)     In accordance with the above schedule, each employee shall receive pay at the straight-time rate for his or her regular weekly hours (excluding any overtime) in advance for each calendar week of vacation that such employee shall be entitled to. The final right in determination of the vacation period of the employee is exclusively reserved to the Employer in order to ensure continuous and maximum service. However, vacation will, so far as is possible and determined by the Employer, be granted at the time most desired by the employee.

(b)     Regular Full Time Employees, in order to qualify for vacation pay, must have worked at least 1,500 regular working hours prior to the vacation period. Regular Part Time Employees must have worked a pro-rated number of hours based on his/her work schedule prior to the vacation period.

(c)     If an employee loses time because of a compensation injury, such employee will be credited with up to a total of 420 hours toward hours needed for vacation eligibility only once in each contract year.

<u>Section 3.</u>     Vacation days shall be accrued based on calendar year. To accommodate both the calendar year accruals and the schedule of vacation days accrued based on years of service at the end of each year, any unused vacation days will be automatically paid out and any fractional vacation days accrued will be automatically paid out to the nearest one (1%) percent of a day.

<u>Section 4.</u>     After completing one (1) year of employment, the Employer agrees that in the event an employee is laid off because of a lack of work before vacation period, he shall be compensated for any accrued vacation time that may be due to him in accordance with the above

41573329                                    3

schedule, based on 1/12th for each month or part of each month worked. In the event that a laid-off employee is called back to work before the vacation period starts, at the time of vacation period, he will be granted the difference between his accrued vacation pay and whatever he had been paid at the time of the layoff.

## ARTICLE 5 - HOLIDAYS

Section 1.    (a)    The Employer agrees to allow to all of its regular full time employees in the bargaining unit the following holidays with pay for the employee's regular daily work hours at the employee's regular hourly rate, although no work is performed on such days; provided the employees work their scheduled work day preceding, and their scheduled work day following, a holiday. Employees who work on any of the above holidays will be compensated for such work of one and one-half times (1½ x) the employee's normal straight-time rate of pay, in addition to receiving the holiday pay provided herein. Employees are required to work on holidays unless notified in advance by Employer. Employees not requested to work on holidays must be given two (2) days' notice except in an emergency. This to be implemented on a rotation basis for Porters only. The Employer shall have the right to substitute another day as a holiday in lieu of the holidays set forth below:

|  |  |
|---|---|
| New Year's Day | Fourth of July |
| Martin Luther King Day | Labor Day |
| Presidents' Day | Thanksgiving Day |
| Memorial Day | Christmas Day |
| Employee's Birthday | |

(b)    In addition to the above listed holidays, employees shall receive one (1) floating holiday each year with the understanding that in order to provide necessary services, the number of employees off on any given day shall be subject to the discretion of the Employer.

Section 2.    If employees work their scheduled work day preceding and their scheduled work day following a holiday or report their scheduled work day preceding and their scheduled work day following a holiday, but due to the weather or conditions beyond their control or that of the Employer they are not able to work on the holiday or are they not put to work on the holiday, they shall be paid straight time for the holiday.

Section 3.    If a holiday falls within the vacation period of an employee, the employee shall receive pay for same as herein provided.

Section 4.    All holidays specified in this Agreement shall be guaranteed subject to Sections 1 and 2 of this Article.

Section 5.    Employees whose regular work schedule falls on a holiday must work on the holiday unless a schedule change has been requested and approved in advance. Employees not reporting to work as scheduled will not be entitled to receive payment for each holiday in addition to any other remedies that may be required.

41573329                                        4

**ARTICLE 6 – FORCE REDUCTION**

Section 1.    The Employer agrees that he will not engage any regular employees in the bargaining unit unless all of the employees regularly employed by the Employer are working at least forty (40) hours per week.  This provision shall apply only if said employees are capable of performing the work desired.  This provision shall not apply to seasonal or temporary help.

Section 2.    In case of a layoff of more than two (2) weeks' duration of any employee employed on a full-time basis, the Shop Steward and the employee shall be notified twenty-four (24) hours in advance.

**ARTICLE 7 - SENIORITY**

Section 1.    The first sixty (60) days of employment for all new full-time employees will be considered a probationary period, and if they prove unsatisfactory, they may be terminated at the discretion at the Employer during such period without appeal by the Union.

Section 2.    All full-time employees of the Employer shall, at the end of the probationary period, be considered regular employees and their names shall be compiled on a list to be known as the "Classification Seniority List."  Such list shall be conspicuously displayed on the job of the Employer for the information of the employees with additions and subtractions from month to month as required.

Section 3.    In determining which full-time employees shall be laid off first and which rehired, due regard shall be had for the experience, efficiency, interest and ability of the employees under consideration for layoff or rehire.  When the factors of experience, efficiency, interest and ability shall be equal or comparable between or among employees, seniority shall prevail.  When seniority prevails, the employee with the least time of employment with the Employer shall be laid off first and rehired last.

Section 4.    Seniority shall cease under the following conditions:

(a)    When an employee quits or resigns his position.

(b)    When an employee is discharged for just cause.

(c)    When an employee is laid off and fails to return to work within three (3) working days after receiving notice of recall by certified or registered mail, e-mail or telegram addressed to the last known address of the employee.

(d)    When an employee is laid off for a period exceeding one (1) year.

(e)    When an employee is shifted from one position to a higher position. Employees who transfer from one classification to another classification shall only gain seniority in the new classification effective the first day of employment in the new classification but will retain Employer seniority for benefit purposes only.

41573329                                             5

    (f)  Failure to call within seventy-two (72) hours when absent without prior arrangements.

  **Section 5.**  In case of layoffs affected employees may use their seniority in another classification to bump a less senior employee provided they are qualified and capable of performing the work in the new classification.

  **Section 6.**  Whenever a vacancy occurs or any new jobs are created within the bargaining unit, Employer will post a notice of such vacancy or new job on the bulletin board for a period of two (2) days. At the end of this period, the opening will be filled by the most senior qualified individual from within the classification, and if no one is qualified, then the most senior qualified individual from within the bargaining unit. If no one is qualified, then the opening may be filled from outside the bargaining unit.

## ARTICLE 8 – TRANSFERS

  **Section 1.**  The Employer shall have the right to transfer employees from one job or operation to another. Employees may not unjustifiably refuse to assist or work on temporary assignments even though not part of their usual work or assignment as the business of the Employer requires.

  **Section 2.**  If an employee is temporarily transferred from one job to another, such employee shall not receive a lower rate of pay than he was formerly receiving unless said transfer is made to prevent a layoff of such employee or such transfer was necessitated by the failure or inability of the employee to perform the former job.

  **Section 3.**  If it is found necessary to transfer an employee from a higher classification to a lower rated classification because of a change in process or reduction in working force requiring a layoff or by reason of the failure or inability of the employee to perform his former job, the employee so transferred shall then be paid for the classification in which he is placed.

  **Section 4.**  If an employee is transferred from a lower rated classification to a higher rated classification, the employee so transferred shall have thirty (30) days in which to qualify for the job and shall retain his present rate of pay for thirty (30) days after the transfer. If, after thirty (30) days, he still retains the higher rated classification job, he shall then be paid the rate of pay for the classification in which he is placed.

  **Section 5.**  Should an employee want to secure another job within the bargaining unit, if qualified, the employee may request such a change and subject to a final decision by Employer, which cannot be grieved, the request will be considered.

## ARTICLE 9 - SAFETY AND HEALTH

  **Section 1.**  The Employer will maintain conditions in the building in accordance with the health and safety provisions of both the Department of Health and the Department of Labor of the State of New Jersey.

41573329          6

Section 2.    Precautions to secure the health and safety of employees shall, as far as is practical, be, at all times, furnished by the Employer, including a supply of "First Aid Cabinets" at convenient locations on the job.

Section 3.    Uniforms:  It is understood that the employee shall be required to wear a designated uniform during all working hours.  The Employer shall supply the said required uniform and the employee will be responsible for the safekeeping of the uniform, reasonable wear and tear excepted.  If in the event any uniforms are lost or stolen, the employee will be responsible to replace the said uniform.

Section 4.    Uniforms for Doormen and Concierge

Two (2) Jackets            One (1) Winter Jacket
Two (2) Pants             Two (2) Shirts

Uniforms for Handymen and Porters

One (1) Winter Jacket for all men working outdoors
One (1) pair of boots that slip over shoes
Six (6) sets of uniforms
One (1) set of rain gear for grounds men/porters

## ARTICLE 10 - VISITATION

Section 1.    Union representatives shall be allowed to visit the job during working hours, upon notification to the Employer, to confer with the representatives of the Employer and the employees.  Such visit shall not interfere with normal production.

Section 2.    The Employer agrees to make available to the representatives of the Union, upon reasonable cause shown and at a reasonable time, the time cards or pay checks of any employee governed by this Agreement.  The Employer agrees to furnish to his employees each week at the time of the payment of the wages earned, a payroll breakdown setting forth the name of the employee, number of hours worked on straight time, the rate per hour, and the total of same; the number of hours worked overtime, the rate per hour, and the total of same; and the entire amount of the wages earned, less the total normal deductions.

## ARTICLE 11 - WAGES

Section 1.    All full-time employees covered by the terms of this Agreement except new employees covered by Section 3 below shall receive the rates of wage increases as set forth below:

| Period | Increase | Handyman Hourly Base Rate (In US Dollars) | Porter Hourly Base Rate (In US Dollars) | Concierge Hourly Base Rate (In US Dollars) |
|---|---|---|---|---|
| Effective January 1, 2016 - December 31, 2016 | 15¢ | 20.62 | 19.39 | 19.48 |



| Effective January 1, 2017 - December 31, 2017 | 25¢ | 20.87 | 19.64 | 19.73 |
|---|---|---|---|---|
| Effective January 1, 2018 - December 31, 2018 | 30¢ | 21.17 | 19.94 | 20.03 |
| Effective January 1, 2019 - December 31, 2019 | 35¢ | 21.52 | 20.29 | 20.38 |

Section 2.    If the Employer shall pay any employee more than the wages herein set forth, the rate should be considered a personalized rate for the employee and not the established rate for the job.

Section 3.

(a)    The minimum new hire wage rate by classification shall be as follows:

    i.   Porter and Concierge:    $12.50 per hour

    ii.  Handyman:    $13.00 per hour

(b)    Any new employee hired under this Section shall receive five (5) wage increases of $0.50 per hour, occurring on the 6th month, 12th month, 18th month, 24th month and 30th month following the employee's date of hire.  On the 36th month following the employee's date of hire, the employee's wage rate shall meet the minimum applicable hourly rate set forth in Section 1 applicable at that time.

(c)    Employees subject to Section 3 shall not receive during the initial 36-month period of employment the scheduled wage increases set forth under Section 1 applicable to other unit employees.

Section 4.    The Employer, at its discretion, has the right and ability to implement merit increases as it sees fit.  These increases will have no bearing on the base pay.  The merit increases can also be removed without any repercussion from the Union and/or the employee.

## ARTICLE 12 – MANAGEMENT RIGHTS

(a)    The Union and the employees covered by the terms of this Agreement agree that they will perform their respective duties in the Employer loyally, efficiently and continuously under the terms of this Agreement, and will use their best endeavors to protect the interest of the Employer, to conserve its property and to give service of the highest productive quality.

(b)    Management of the Employer's operations and the direction of its work force, including the right to establish new jobs, change existing jobs within the existing job classifications, increase or decrease the number of jobs, change materials or equipment, change any method of operations, shall be vested solely and exclusively with the Employer.  Subject to the provisions of this Agreement, the Employer shall have the exclusive right to schedule and assign work to be performed and the right to hire and rehire employees, promote, recall employees who are laid off, demote, suspend, discipline or discharge for just cause, or lay off employees, based on seniority, because of lack of work or other legitimate reasons, it being understood, however, that the Employer shall not discipline or discharge an employee except for just cause.

(c)    The Employer shall have the right to establish, maintain, amend and enforce reasonable rules and regulations to assure orderly operation of the Employer's business.  Such rules and regulations shall not be contrary to this Agreement.

(d)    The failure to exercise any of the functions and responsibilities herein reserved shall not constitute a waiver thereof.

## ARTICLE 13 - DISCHARGES

No regular full-time employee shall be discharged except for just cause.

## ARTICLE 14 – GRIEVANCE PROCEDURE AND ARBITRATION

Section 1.    Any dispute, difference, controversy or grievance arising under this Agreement between the Employee and the Union must first be submitted in writing by the party claiming to be aggrieved to the other party within thirty (30) days from the date the party knows or reasonably should have known that a violation of this Agreement has occurred.  The arbitrator shall have the authority to extend the time limitations herein and below for good cause shown.  The time limitations herein agreed to are not applicable to any cases involving the fringe benefit funds and wage violations.

(a)    STEP 1:  Within fourteen (14) days of notice of the grievance the business representative of the Union and the Employer must confer to discuss a resolution of the grievance.  If no agreement is reached, the parties shall proceed to Step 2.

(b)    STEP 2:  Within fourteen (14) days of Step 2 either party may submit the grievance to the Office of the Contract Arbitrator (OCA) located at 7 Penn Plaza, Suite 301 (370 Seventh Avenue), New York, New York, 10001, to be heard before a contract arbitrator appointed from the OCA panel of arbitrators.  The cost of the arbitrator's fee shall be evenly divided between the Employer and the Union.  If either party fails to appear on the hearing date, the arbitrator may render a decision based on the testimony of the party appearing.  The non-appearing party, however, shall be required to pay the full fee charged by the arbitrator.

Section 2.    The arbitrator's award shall be final and binding and shall be enforceable under federal labor law.

Section 3.    The arbitrator shall have no authority to add to, subtract from, or modify the provisions of this Agreement and shall confine his decision to a determination based upon the facts presented.

Section 4.    The current panel of contract arbitrators shall be John Armor, Howard C. Edelman, Stuart Bauchner.  The panel of contract arbitrators shall be appointed by mutual agreement of the Union and the Employer.  Upon thirty (30) days' written notice to each other, either the Union or the Employer may terminate the services of a contract arbitrator.

41573329                                    9                                    

**ARTICLE 15 – MILITARY SERVICE**

Any employee entering military service in any branch of the United States Government must be rehired by the Employer and shall resume seniority when honorably discharged from such service, provided such employee requests his job back within the time allowed under the applicable laws. He shall be paid his vacation pay for the contract year providing the employee returns to his former job within sixty (60) days after discharge.

**ARTICLE 16 – WELFARE PLAN**

Section 1.    (a)    The Employer agrees to make payments into a health trust fund known as the Building Service 32BJ Health Fund for the Tri-State plan of benefits to cover all full-time non-probationary employees covered by this Agreement under such provisions, rules and regulations and for such benefits as may be determined by the Trustees of the Health Fund, as provided in the Agreement and Declaration of Trust, at the following monthly contribution rates:

| | |
|---|---|
| Effective January 1, 2016 | $895.00 per month |
| Effective January 1, 2017 | $959.00 per month |
| Effective January 1, 2018 | $1,036.00 per month |
| Effective January 1, 2019 | $1,116.00 per month |

There shall be a waiting period of ninety (90) days of employment before becoming eligible to be participants in the 32BJ Health Fund and no contribution shall be made on behalf of an employee over the ninety (90) day period.

Section 2.    (a)    The Employer hereby agrees to file appropriate contribution reports as authorized by Trustees of the Welfare Fund, together with the Employer contributions, as are required herein, and do so on or before thirty (30) days following the end of the month for which the payment is being made.

(b)    The Employer further agrees that should they fail to pay their contribution to the Welfare Fund on or before the thirty (30) days mentioned in this section, the Employer shall pay a penalty of twelve (12%) percent for each additional month, or part of a month, for which the Employer fails to pay the contribution within ten (10) days after receiving written notification from the Welfare Plan.

(c)    The Employer further agrees that contributions received later than thirty (30) days following the end of the month for which the payment is being made shall be credited to the month immediately preceding the month in which the payment is received.

Section 3.    The Trustees shall have the right to expend monies as provided by the Trust Agreement to set aside and maintain a Reserve Fund and to establish additional benefits that are authorized by law. No Employer or employee covered by this Agreement, or the Union, shall have any right, title or vested interest or claim against any of said Funds. The Employer

shall not be required to increase their contributions over and above that provided in Section 1 of this Article during the terms of this Agreement

**Section 4.**    The Employer hereby agrees to permit an authorized representative of the Union, as well as an authorized representative of the Welfare Fund, to inspect its payroll records for the purpose of checking the accuracy of the contributions required to be made by the Employer to said Fund.  The failure of the Employer to pay required contributions to the Welfare Fund shall authorize the Trustees to conduct an audit of the Employer's records for the purpose of determining the amount due the Welfare Fund.  Should the Employer refuse to allow an audit, the Trustees may waive an audit and select the highest number of employees appearing on any previous Employer's report in computing the amount due the Fund from the Employer and charge the Employer with such amount unless the Employer submits records to the contrary.

**Section 5.**    LEGAL ACTION:  In the event the Employer fails or refuses to make contributions within the time provided for herein, then the Trustees of the Welfare Fund are authorized to take any and all legal action, including arbitration under the Arbitration Clause provided for in this Agreement for the purpose of collecting the delinquency from the Employer. In the event the matter is referred by the Trustees to an attorney for legal action and suit or arbitration is instituted, then the Fund may have Judgment entered based upon the average number of employees reported by the Employer on any report filed by him during the one (1) year period, preceding the institution of arbitration or court action.  In the event legal action is taken as provided for herein, the Employer shall become responsible for the following:

(a)    A legal fee of twenty (20%) percent of the gross amount due from the Employer,

(b)    Cost of making an audit,

(c)    Interest at the rate of twelve (12%) percent per annum of each monthly delinquency,

(d)    All arbitration and court costs.

## ARTICLE 17 – MISCELLANEOUS WORKING CONDITIONS

**Section 1.**    The Employer shall protect the employees with Worker's Compensation Insurance, Social Security and Unemployment Insurance as required by Federal and State Law.

**Section 2.**    Sick time for regular full time employees is accrued at the rate of six (6) days per calendar year.  New employees with less than one (1) year of service accrue sick time at the rate of one (1) sick day for every two (2) months worked, exclusive of the probationary period, up to six (6) per year.  All unused sick days shall be automatically paid out as per the enhanced payout schedule below:

41573329                                      11

| Total Sick Days Used | Total Sick Days Unused (Remaining) | Eligible Payout | Bonus | Total Payment | Total Benefit |
|---|---|---|---|---|---|
| 0 | 6 | Eligible to receive payout for 11 days vs. 6 days | 5 | 11 | 11 |
| 1 | 5 | Eligible to receive payout for 9 days vs. 5 days | 4 | 9 | 10 |
| 2 | 4 | Eligible to receive payout for 7 days vs. 4 days | 3 | 7 | 9 |
| 3 | 3 | Eligible to receive payout for 5 days vs. 3 days | 2 | 5 | 8 |
| 4 | 2 | Eligible to receive payout for 3 days vs. 2 days | 1 | 3 | 7 |
| 5 | 1 | Eligible to receive payout for 1½ days vs. 1 day | ½ | 1½ | 6½ |
| 6 | 0 | Not Eligible to receive payout | 0 | 0 | 6 |

    Section 3.    The Employer shall not discriminate against any employee on account of race, age, color, creed or national origin, sex or membership in any other classification protected by applicable law. Reference to the masculine shall include the feminine.

    Section 4.    The Employer agrees that all employees, after having passed their probationary period and who shall suffer the loss by death of father, mother, spouse, children, brother or sister of said employee, shall be granted up to three (3) days off with pay; namely, the day of the funeral and the two (2) days immediately preceding, providing said days are scheduled work days and provided the employee attends the funeral of the deceased. A day's pay shall be computed the same as the holiday pay under Article 5, Section 1.

    Section 5.    The Employer agrees that all employees, after having passed their probationary period and who shall suffer the loss by death of their mother-in-law or father-in-law, shall be granted one (1) day off with pay; namely, the day of the funeral, provided such day is a scheduled work day and the employee attends the funeral of the deceased.

    Section 6.    Classification of Workers:

- Regular Full Time: Hours of work - 40 hours per week. Full time employees are entitled to all Union Benefits as per the contract.

- Regular Part-Time Concierge: The bargaining unit shall include one (1) regular part-time concierge position assigned to the front desk which shall not exceed nineteen (19) hours of work per week. This position shall be eligible for all terms and benefits under this Agreement except: (1) this position shall not be eligible for health or pension benefits; (2) sick leave and vacation and paid holidays shall be granted on a pro-rated basis; and (3) holiday pay will be paid at time and one-half for the holiday if the employee works; otherwise, there shall be no holiday pay; the employee must work his/her scheduled work day before and after a holiday to be eligible for time and one-half on the holiday.

  In the event any employee filling this position works in excess of one thousand (1,000) hours during any calendar year, the Employer shall pay retroactive pension contributions on the employee's behalf for that calendar year. In the event any employee filling this position works more than one hundred and sixty days (160) during any calendar year, the Employer shall commence paying health fund contributions on the employee's behalf and such employee shall be eligible

41573329                                             12

for health coverage for the rest of that calendar year.  The terms set forth above notwithstanding, no employee who filled this position, or other comparable part-time concierge position at the property prior to the calendar year 2012, shall be eligible for health or pension benefits for such work and the Employer shall not be liable for any health or pension contributions on any employee's behalf for such work prior to 2012.

- Temporary Employees:  The Employer shall have the right to hire temporary employees for a period not to exceed four (4) consecutive months.  Temporary employees shall be used for work that exceeds the capacity of the permanent bargaining unit employees during the employees' regular working hours or to fill in for regular bargaining unit employees who are off duty for sick leave, vacation leave, disability, workers compensation, family medical leave or other absences or leaves.  Such temporary employees shall not be covered by this Agreement unless their employment exceeds four (4) consecutive months, after which they shall become regular employees and covered by this Agreement, provided, however, the position may be eliminated on one (1) week's written notice to the Union and the employee.  Temporary employees shall not be used to effectuate any reduction in wages, hours or number of positions within the bargaining unit and no bargaining unit employee shall be laid off while any temporary employees remain employed unless the layoff is implemented and the regular worker to be laid off is not qualified for the position held by the temporary employee.

## ARTICLE 18 – STRIKES AND LOCKOUTS

The Employer will not lock out any employees and the Union will not authorize or engage in any strike, stoppage, slowdown or picketing during the term of this Agreement.

## ARTICLE 19 – TRAINING FUND

The Employer shall make contributions to the Local 32BJ Thomas Shortman Training Fund of $14.13 per month per employee effective January 1, 2016 under the terms of that Fund. There shall be a waiting period of ninety (90) days of employment before becoming eligible to be participants in the Training Fund and no contribution shall be made on behalf of an employee over the ninety (90) day period.

## ARTICLE 20 – PENSION FUND

Section 1.   The Employer shall maintain its participation in the Service Employees 32BJ North Pension.  Monthly contributions shall be as per the following schedule:

| | |
|---|---|
| January 1, 2016 to March 31, 2016 | $137.79 per month |
| April 1, 2016 | $147.44 per month |
| April 1, 2017 | $157.76 per month |
| April 1, 2018 | $168.80 per month |
| April 1, 2019 | $180.62 per month |

41573329                                  13

Section 2.   (a)   The Employer hereby agrees to file appropriate contribution reports as authorized by the Trustees of the Pension Fund, together with the Employer contributions as are required herein and do so on or before thirty (30) days following the end of the month for which the payment is being made.

(b)   The Employer further agrees that should they fail to pay their contributions to the Pension Fund on or before the thirty (30) days mentioned in this section, the Employer shall pay a penalty of twelve (12%) percent for each additional month or part of a month for which the Employer fails to pay the contribution within ten (10) days after receiving written notification from the Pension Fund.

(c)   The Employer further agrees that contributions received later than thirty (30) days following the end of the month for which the payment is being made shall be credited to the month immediately preceding the month in which the payment is received.

Section 3.   The Trustees shall have the right to expend monies as provided by the Trust Agreement to set aside and maintain a Reserve Fund and to establish additional benefits that are authorized by law.  No Employer or employee covered by this Agreement, or the Union, shall have any right, title or vested interest or claim against any of said Funds.  The Employer shall not be required to increase their contributions over and above that provided in Section 1 of this Article during the term of this Agreement.

Section 4.   The Employer hereby agrees to permit an authorized representative of the Union, as well as an authorized representative of the Pension Fund, to inspect its payroll records for the purpose of checking the accuracy of the contributions required to be made by the Employer to said Fund.  The failure of the Employer to pay required contributions to the Pension Fund shall authorize the Trustees to conduct an audit of the Employer's records for the purpose of determining the amount due the Pension Fund.  Should the Employer refuse to allow an audit, the Trustees may waive an audit and select the highest number of employees appearing on any previous Employer's report in computing the amount due the Fund from the Employer and charge the Employer with such amount unless the Employer submits records to the contrary.

Section 5.   LEGAL ACTION:  In the event the Employer fails or refuses to make contributions within the time provided for herein, then the Trustees of the Pension Fund are authorized to take any and all legal action, including arbitration under the Arbitration Clause provided for in this Agreement for the purpose of collecting delinquency from the Employer.  In the event the matter is referred by the Trustees to an attorney for legal action and suit or arbitration is instituted, then the Fund may have judgment entered based upon the average number of employees reported by the Employer on any report filed by him during the one (1) year period, preceding the institution of arbitration or court action.  In the event legal action is taken as provided for herein, the Employer shall become responsible for the following:

(a)   A legal fee of twenty (20%) percent of the gross amount due from the Employer,

(b)   Cost of making an audit,

41573329                                                14

      (c)      Interest at the rate of twelve (12%) percent per annum of each monthly delinquency,

      (d)      All arbitration and court costs.

## ARTICLE 21 - TERMS APPLICABLE TO ALL BENEFIT FUNDS

All contributions to all benefit funds shall commence upon an employee's completion of ninety (90) days of employment, and there shall be a corresponding ninety (90) day wait period for new hires to participate in the funds.

## ARTICLE 22 - DURATION OF AGREEMENT

This agreement is effective January 1, 2016 through December 31, 2019.

James Monroe Condominium at Newport, Inc.

Dated: 08/28/2016

SEIU Local 223J

Dated: 8/25/16

41573329

15

E
X
H
I
B
I
T

C

# EXHIBIT "C"

**Sent on Jun 12, 2019 at 5:14 PM**

**To: 1008 Recipients**

**From: James Monroe Condominium Association [management@jamesmonroe.co]**

**Subject: Security Update / Unit Alterations**

Dear Residents of THE EMERALD,

We wanted to inform you that a security event occurred early last Sunday morning and this morning at our side entrance.

An individual attempted to steal steel weights left by Otis Elevator for testing at the side entrance. Today, he attempted to steal a broken washer outside  for most likely, the metal weight. The individual's attempts were foiled by our Superintendent and Assistant Manager as they intervened on two occasions. The man was caught on camera along with his vehicles' license plates from two different vehicles. Detectives from the Jersey City Police Department are now looking to apprehend the individual based on his photo, his vehicles and his license plates.

We would like to offer a "well done" to both of our staff here at the James Monroe.

Lastly, We wanted to remind our owners and residents with regard to any plumbing, tiling and electrical work

Please contact a third party to obtain a  licensed and insured contractor for work within your unit. These vendors or the owner must contact the management office prior to the work done to ensure all necessary coverage is obtained.

Work done by our staff must be performed off their work hours and the association will not be responsible in the event damage occurs.

Thank you,

**Attachments: None**

**Sent on Aug 30, 2019 at 11:36 AM**

**To: 939 Recipients**

**From: James Monroe Condominium Association [management@jamesmonroe.co]**

**Subject: Recent Building Security Incident**

Dear Resident,

Be aware of your surroundings. Please do not panic with the recent potential security incident shared below by a resident owner. This is to educate residents about the importance of building security. We strongly ask for every resident's cooperation with the building security procedure detailed below. **If you see something, say something.**

If you receive a food delivery unannounced do not open the door. Call the package room or front desk. Their contact information is as follows:

**Front Desk: 201-626-5018**
**Package Room: 201-626-5654**

Do not leave your cars unsecured in front of the building while dropping your family in the lobby. A Carjacking occurred right in front of our building for a building resident. Luckily, since the car keys were with the resident the engine disengaged and stopped at Duane Reade located across the street. The car thief left the car and ran away.

Do not allow kids to play unsupervised in the party room or around the common areas of the building. Also, please have an adult supervise when they play in the backyard.

Like the other buildings in Newport, we will implement locking the revolving door at night to help prevent unauthorized people from entering the building and enabling key fob access time in accordance with all surrounding Newport building time schedules.

The Board is in discussion with neighborhood community boards to present to Lefrak the concerns and request additional patrolling with local law enforcement. Volunteers who want to form or be part of further improving community security with suggestions and ideas are welcome.

The Board and management are working together to strengthen the security even further with changing times. We plan to have our staff attend training programs for different emergency situations to ensure their preparedness in the event of an emergency.

~~

"Hello Management and Board members,

I am writing this email to appreciate Barbara's vigilance.

This Monday I was moving back to my condo. With movers doing the move. An unknown person joined the moving party. She not only spotted the person, but also checked with relevant parties and then informed me.

As a result, I was able to confront the person and get him escorted out of the window.

It saved a potential mishap.

Thank you Barbara!"

**Attachments: None**

## Security Memorandum - Vendors, Contractors, Deliveries, Guests, Tenants and Shopping/Luggage Carts

The security and safety of our residents and unit owners are of utmost importance to the James Monroe Board of Directors and Management. Hence, we expect all parties involved in our building to strictly adhere with all policies and procedures of the James Monroe Condo Association particularly when it involves the security of our residents and building. Therefore, the Board of Directors and Management Office will have zero tolerance with respect to any violation or breach resulting from any failure of our staffs to enforce our policies and procedures.

**Effective immediately,** the Board of Directors and Management would like ask all staffs of the James Monroe Condo Association to strictly effectuate the following security policies and procedures to proactively protect our residents and building.

All registered guests must check in with the front desk doorman for verification and registration. All guests must present a valid ID to confirm their identity and NO guest will be allowed to enter our building until the doorman calls the unit owner or resident to AUTHORIZE the entry. The front desk doorman must 1) ascertain that the guest identity is accurate and 2) register/write the required information of the guests in the James Monroe Guest Log Book. Any guest who refuses to adhere to our policies and procedures will not be allowed to enter our building unless the unit owner or resident personally picks up and registers the guest at the front desk.

All tenants in the building must have a minimum lease term of one year. Short term occupancy or lease term of less than one year is not permissible in our building. Any illegal tenant and unregistered guest who refuses to leave and vacate our building should be referred to the Management Office and Newport Security immediately. If illegal tenants and unregistered guests fail to cooperate and comply with our policies and procedures, call the Management Office and the Jersey City Police for assistance to enforce the eviction.

**Each vendor and contractor must register and surrender a valid identification card at the package/mail room in the back of the building. The ID will be returned to the vendor and contractor when he/she leaves our building**. This will help us ensure the vendor or contactor leaves our building through the back entrance. The doorman in the package/mail room must call each unit owner for authorization BEFORE allowing the vendor or contractor to have access in our building. The doorman must call the phone numbers listed in the Buildinglink and not the ones provided by the vendor or contactor. Vendors and contractors who refuse to abide by our procedures will not be allowed to enter our building. Hence, in such cases, deliveries, vendors and contractors must be fetched by the unit owners/residents themselves in the package/mail room.

Each doorman is responsible in making sure the information provided by the vendor and contractor are accurate. Thus, the doorman will be responsible for writing down the required information in the James Monroe Vendor/Contractor Log Book to ensure the information is readable and accurate.

All shopping/luggage carts and move in and move out activities in the building must go through the back entrance of the building. This will ensure the traffic monitoring of the main entrance of the building will not be impeded or negatively impacted.

**Signature**_____       **Date:**_____

To:      All James Monroe Staff
From:   Taylor Management
RE:      **Concierge/Package Room Service**
Date:    June 5, 2017

- All guests, visitors, and food delivery person should sign and come through the back of the building. The Concierge should call the unit owner before they are allowed to proceed inside the building.

- Front Desk staff cannot have long conversations with residents as it distracts them from maintaining the security of the building by watching security cameras and monitoring who is entering the building.

- All deliveries (such as from IKEA, Home Depot, Sears etc.) should enter the building through the rear service entrance door.

- Please monitor the security cameras, revolving doors, and handicap door area. There is no need to be behind the desk at all times as we have cordless phones and radios.

- All the concierges should focus on the building security to avoid potential security breaches in the building.

- All incoming/outgoing calls should be performed using the cordless telephone at the front desk or Use the walkie talkie if needed

- If the Concierge staff leave their post at the Front Desk and Package Room the Management Office will have to take disciplinary action and write up the staff member. If you require a restroom break please communicate with the package room concierge to cover the front desk

## Rear entrance security

- All vendors should use the rear service entrance for access. All vendors/contractors working in the units should have a unique swipe card

to get into the building. Vendors/contractors cannot share a single key fob, all must have their own. All vendor staff photo ID should be at the Management Office's files for record keeping.

- Association vendors who come into the building should be signed in and must at all times be accompanied by a Handyman.

- All buzzer doors could be handled by the staff in the package room from 7 AM-11 PM.

- The Package Room staff, when not handling mail packages, should be monitoring the security cameras at all times.

- The rear service area should be secured at all times. No residents or vendors should park their vehicle in the service area. Please notify the Management Office that vendors for the Association have arrived and ensure they have a parking pass for the meters.

- Unit owners must be informed immediately once a perishable delivery arrive. They must be delivered to the respective unit owner within a reasonable time (0-3 hours) if the unit owner is not present to receive the perishable delivery every effort must be made by our mail and package to contact the unit owner via phone, email, building link text.

- Count every single package with the Carrier in front of you when they arrive at the building and sign your name when received. Make sure the Carrier scans each package in front of you Then enter/scan each package into Building Link Have the Resident acknowledge how many packages they are receiving & ONLY the Resident can sign for the package. DO NOT SIGN FOR THE RESIDENT.

# THE JAMES MONROE CONDOMINIUM AT NEWPORT

## FRONT DESK MANUAL

45 River Drive South
Jersey City, New Jersey 07310
Telephone: 201.626.5656
Fax: 201.626.5659
E-Mail: Management@jamesmonroe.co

## Table of Contents

Important Telephone Numbers ...................................................................5

Announcing Guests ...................................................................6

Appearance ...................................................................6

Balconies ...................................................................6

Bicycle Room ...................................................................6

Board of Directors ...................................................................6

Boiler Failure on Fire Panel ...................................................................7

Break Room ...................................................................4

Breaks / Meals ...................................................................7

Bulletin Board ...................................................................7

Community Room ...................................................................8

Confidentiality ...................................................................8

Contractors ...................................................................8

Correspondence between Residents and the Management Office ...................................................................8

Delivery Procedures / Moves ...................................................................8

Elevators ...................................................................8

Emergencies ...................................................................9

Familiarizing Yourself with Residents ...................................................................9

Fire Safety Plan ...................................................................9

Fire Extinguisher ...................................................................9

First Aid Kit ...................................................................9

Food at the Front Desk ...................................................................10

Food Delivery Persons ...................................................................10

Front Desk Staffing ...................................................................10

Front Doors ...........................................................................................................................10, 11

Incident Reports ..................................................................................................................... 12

Infractions ............................................................................................................................... 12

Intrusion Alarms .................................................................................................................... 12

Keys ....................................................................................................................................12, 13

Laundry Machines/Washers / Dryers ............................................................................... 13

Loading Zone .......................................................................................................................... 13

Lobby Shades .......................................................................................................................... 13

Lockouts ................................................................................................................................... 14

Log Book .................................................................................................................................. 14

Management Agent (Property Manager) ........................................................................... 14

Meeting Room ......................................................................................................................... 14

Move-In Move-Out Procedures ........................................................................................... 14

Music ........................................................................................................................................ 15

Open Houses ............................................................................................................................ 15

Payday ...................................................................................................................................... 15

Package Room ....................................................................................................................15, 16

Parking ..................................................................................................................................... 16

Permission to Enter (PTE) .................................................................................................... 16

Personal Communications .................................................................................................... 16

Pet Rules, Regulations and Fees ...................................................................................16, 17

Residents .................................................................................................................................. 16

PSE&G ....................................................................................................................................... 17

Ring Road ................................................................................................................................. 17

Rules and Regulation (House Rules) .................................................................................. 17

**Service Requests / Work Orders** ................................................................17, 18

**Shift Changes** .............................................................................. 18

**Sick Day Procedures** ....................................................................... 18

**Side Jobs / Private Work** ............................................................... 18. 19

**Notices (Emergency)** ....................................................................... 19

**Smoking Policy** ............................................................................. 19

**Supply of Forms** ........................................................................... 19

**Time Clock** ................................................................................ 20

**Tips (Gratuities)** .......................................................................... 20

**Uniforms** .................................................................................. 20

**Vacation Requests** ......................................................................... 20

**Vending Machines** .......................................................................... 20

**Walkie – Talkies (2 – Way Radios)** ......................................................... 20

**Water Contamination** ....................................................................... 21

**Emergency Water Shut Off** ............................................................... , 21

**Website** ................................................................................... 21

**Weekly Schedule** ........................................................................... 21

**Wheelchair** ................................................................................ 21

**IMPORTANT TELEPHONE NUMBERS**

| | | |
|---|---|---|
| **Jersey City Police Department** | | **201-547-5477** |
| | | **911** |
| **Jersey City Fire Department** | | **201-547-4240** |
| | | **911** |
| Management Office | | 201-626-5656 |
| | Dilia Pimentel, Property Manager (Cellular) | 646-286-4206 |
| | Rakhi Upadhyay, Property Administrator (Cellular) | 973-760-7099 |
| James Monroe Front Desk | | 201-626-5018 |
| PSE&G (Gas and Electric) | | |
| | Customer Service | 800-436-7734 |
| Suez (Water Service) | | 201-200-2780 |
| Verizon (Fios - Cable, Internet and Telephone Service) | | |
| | Customer Service | 800-427-9977 |
| Comcast Cable | | |
| | Customer Service | 888-882-3392 |
| Newport Telecommunications | | |
| | Customer Service | 201-626-2020 |
| Security Booth located on Ring Road | | 201-626-2086 / 201-626-3607 |
| Central Parking Corp.  (Garage) | | 201-626-3224 |
| Newport Health Club | | 201-626-3161 |
| Newport Sailing Club | | 201-626-3210 |
| Jersey City Board of Education | | 201-420-2162 |
| New Jersey Transit | | 800-772-2222 |
| Newport Management | | 201-626-2056 |
| United Federated Systems (Security System) | | 973-890-7651 |
| Otis Elevator   / Building ID: GNJ230344 | | 800-233-6847 |
| Metro Fire and Communication | | 973-429-4846 |
| Professional Restoration | | 201-868-4817/917-710-5297 |

5

PROCEDURES

ANNOUNCING GUESTS

Challenge every person that walks into the building with the exception of residents and employees.

Ask the person who they are and the purpose of their visit.

Call resident to announce visitor and if the resident agrees to see the person, have them sign in and direct them to the elevator.  If the resident does not respond to the call, take a message and be certain that the visitor leaves the building.

APPEARANCE

Concierges must be neat and clean and must wear the proper uniform.

BACKYARD - AVAILABLE TO RESIDENTS AND THEIR GUESTS FROM 9 AM UNTIL 8:30 PM

Entrance door from backyard back into building is equipped with Security System.  The resident merely has to ring the bell for the Concierge to unlock the door.

BALCONIES

It is understood that the Concierges are not in a position to see the balconies.  However, if upon entering the building the Concierges note that storage items are outside and unattended, the policy of the building is as follows:

Please be aware that the severe wind conditions that exist in the Newport area can turn items left out on balconies/terraces into airborne objects capable of injuring individuals below.  It is the policy of the James Monroe Board and Management that NOTHING that has a capability of becoming airborne can be left out (unattended) on balconies/terraces. Unit owners or residents that disobey this will be held legally responsible for any damages/injuries that their items cause.

BOARD OF DIRECTORS – consists of 9 unit owners elected by members of the Association annually.

On occasion, documents or envelopes addressed to the Board members will be left with the Front Desk/Package room for distribution.  These are to be treated as a high priority and handled with confidentiality.

Personal information about Board members including their telephone numbers and unit numbers should never be released to anyone. If a Resident requests to speak with a Member of the Board, please take a message from the individual and forward the document to Management.

BOILER FAILURE ON FIRE PANEL

An alarm exists on the fire panel to alert the Front Desk in the event of a boiler failure.  If a boiler overheats or fails, a yellow light will appear on the fire panel and a buzzing will sound the words "Boiler Low Temp" will appear.  In the event that this occurs the Concierge is to take the following action:

1. Check the panel to be certain that the yellow light is lit.
2. Contact the Superintendent immediately.  In the event that he is unreachable, contact the handyman on duty.
3. After the problem has been resolved, push the reset button on the Fire Alarm Panel to clear it.  This should clear the "Trouble" light at the Front Desk as well.
4. Create an entry in the Log Book.
5. Write an Incident Report and turn it into the Management Office.

BREAK ROOM – LOCATED OFF THE SERVICE CORRIDOR FOR THE USE OF ALL EMPLOYEES FOR THE PURPOSE OF HAVING MEALS AND CHANGING CLOTHING.

The Break Room is equipped with a full bathroom for the use of the employees.  Visitors and/or contractors may be directed to this room but not to the bathroom adjacent to the Management Office.

BREAKS/MEAL TIMES

Maintenance Staff:  All lunch breaks must be taken between 12:00 Noon and 12:30 PM for daytime shifts and between 6:00 PM and 6:30 PM for evening shifts unless otherwise authorized by the Superintendent or Management in his absence.

BULLETIN BOARD – LOCATED IN THE SERVICE CORRIDOR

Any person wishing to post anything on the Bulletin Board should be directed to the Management Office to receive their approval.

MEETING ROOM – LOCATED BY THE MANAGEMENT OFFICE

This room has been provided for all residents and their visitors to enjoy.  No resident can have exclusive use of the Meeting Room and therefore there can be no parties or gatherings in that room.  No food or beverages are permitted in the room.  The room is to be kept locked at all times.  When a resident wishes to use the room, the Concierge may give them the key but a record must be made of the name of the person and their unit number.  The room must be locked again after they leave.

CONFIDENTIALITY – ALL PERSONAL INFORMATION ABOUT RESIDENTS MUST BE KEPT CONFIDENTIAL

Revealing personal information about a resident is a serious offense that will result in disciplinary action.

**CONTRACTORS** – All Contractors must be approved by the Management. The Front Desk will receive confirmation that the Contactor has been approved in writing.  No construction, repair work, or other installation involving noise shall be conducted in any Unit except on weekdays (not including legal holidays) and only between the hours of 9:00 am and 5:00 pm unless such construction or repair work is necessitated by an emergency. Holidays may include the following:

| | | |
|---|---|---|
| Martin Luther King Jr. Day | President's Day | Ash Wednesday |
| Purim | Good Friday | Easter |
| Mother's Day | Memorial Day | Father's Day |
| Independence Day | Labor Day | Rosh Hashanah |
| Yom Kippur | Columbus Day | Diwali |
| Halloween | Election Day | Veteran's Day |
| Thanksgiving | Hanukkah | Christmas Eve |
| Christmas | New Years Eve | New Year's Day |

All contractors are required to use the service entrance.

CORRESPONDENCE BETWEEN RESIDENTS AND THE MANAGEMENT OFFICE

   Any correspondence between residents and the Management Office should be handled by the Concierge/package room as other types of delivery.  However, if an envelope or parcel remains unclaimed for more than 3 days the Management Office should be advised.

DELIVERY PROCEDURES /MOVES

   The Front Desk will be advised the week of any move or delivery scheduled.  All deliveries/moves are via the service entrance and will not be permitted after 6:00 PM or on Holidays unless specific permission has been granted by the Management Office.  (See Appendix 2 for the Move-In / Move-Out Application). Delivery trucks will not be permitted to enter the Ring Road at 6:00 PM or thereafter.

ELEVATORS

   The building has four elevators numbered 1, 2, 3 and 4. Car #4 serves as both a passenger and a service elevator.  Residents moving in and out of the building as well as all deliveries must be made using the service elevator.

   The use of the service elevator must be arranged in advance with the Management Office.  The Concierge can confirm that such arrangements have been made by referring to the Weekly Activities schedule in Edge. If a resident or other person uses the Service Elevator without proper authorization, the Concierge must inform the Management Office by filling out an Incident Report.

   All of the elevators are equipped with Firemen's Recall. Whenever the fire alarm is activated all four elevators will recall to the lobby level.  In the event the alarm system detects a fire on the lobby level, the elevators will recall to the second floor.  Once the elevators have been recalled, they will sit idle until the Fire Department arrives and takes control of them. The elevators will remain in Firemen's Service mode until the fire alarm panel has been re-set.

Please report any elevator irregularities to the Superintendent directly and to the Management Office by way of an Incident Report.  In the event that two or more elevators become inoperative and you cannot reach the Superintendent or either Handyman, the Concierge is authorized to call for service. The information is as follows:  OTIS ELEVATOR 800-233-6847 BUILDING ID GNJ230344 you will be asked for the building ID number when you call for service.

In the event someone is trapped in the elevator, the Concierge is to immediately contact the Superintendent and/or either Handyman.  If any or all of them do not respond quickly, the Concierge is to call 911 and report that you have a person trapped in the elevator.

EMERGENCIES

If an emergency occurs during the hours that the Superintendent is scheduled to work, you should immediately notify him of any emergency situation.

If you cannot reach the Superintendent and if the situation warrants, you can contact the Property Manager at 646.286.4206.  However, if the nature of the emergency is such that time is of the essence and specialized assistance is required, call 911.  Contact the Ring Road Guardhouse to advise that we are expecting an emergency service vehicle.  The telephone number for the Guardhouse is 201 626 2086/3607.

FAMILIARIZING YOURSELF WITH THE RESIDENTS

As a security precaution it is essential that each Concierge is familiar with the residents of the building.  If you come across anyone you do not recognize, you should ask them to identify themselves by their name and unit number.  This information can be confirmed with the Management Office.

FIRE SAFETY PLAN

A Fire Safety Plan has been written specifically for the James Monroe building and has been made available to the residents.  The plan provides useful information regarding what to do in the event of a fire or other emergency.  Each Concierge should read the Plan which is attached as Appendix #3.

FIRE EXTINGUISHER

There is a fire extinguisher in the Package Room behind the Front Desk.  All Concierges should read the instructions on the label in advance so that they would be prepared in the event that they need to use it.

FIRST AID KIT

There is a first aid kit in the package room.  The Concierge is responsible for monitoring and logging the use of first aid supplies.  Refill forms are included in the kits which are to be completed and submitted to the Management Office when a product has been used.

9

FOOD AT THE FRONT DESK

<u>Eating at the front desk is not permitted</u> unless a Concierge has no back up on a particular schedule and should be done so with discretion.

FOOD DELIVERY

   Should be conducted by the service area. When a food delivery person arrives at the building the resident must be called to announce the delivery.  The delivery person is to be notified that they are not to leave menus under doors or in hallways.  If menus are left and turned into the Concierge, they must be given to the Management Office.

FRONT DESK STAFFING

   The Front Desk concierge should not receive packages, envelopes, Laundry or deliveries all these should be redirected to the package room. Front desk should assist residents with carts, strollers or with any assistant needed.

FRONT DOORS

   There are three (3) doors in the front of the building. They are: the electric sliding door, the electric handicapped door and the revolving door.

1.   Electric Sliding Door – This door operates automatically by a motion sensor on either side of the glass doors.  The doors can be held open by way of a toggle switch, located on the frame of the door (inside, right side).
2.   Electric Handicapped Door – This door can be opened by pushing from the inside or pulling from the outside.  The door can also be opened by a motor, which is activated by pushing the red button located in the frame of the door (both inside and outside).
3.   Revolving Door – The revolving door is the building's main entrance.  There are several safety features of the door that the Concierges should be aware of:

    A.   As you enter the door, the black rubber edge on the right is equipped with a safety feature that stops the motion of the door when it is bumped.  If a hand, briefcase or person enters and gets caught between the moving door and the rubber safety edge, the door will stop. When the item is removed, the door will automatically begin to revolve in a few seconds.
    B.   If it is necessary to collapse the door in an emergency, break the glass cover and press the red button.  This will permit the door to be collapsed and opened for emergency exit from the building.
    C.   It is not necessary to push the door.  The door is set at six revolutions per minute, the manufacturer's recommended speed for a residential hi-rise.

D. If it is ever necessary for you to turn the door off completely, there is a switch located at the top left of the door.  In the event that the door malfunctions or if someone falls and is unable to get up, activate this switch.

Residents pushing lobby carts and double strollers, baby carriages MUST use the electric handicap door.

For safety reasons, there is a remote control box, located at the Front Desk that controls the operation of the revolving door.  This is a blue box with a red button at the top.  The red button will stop the revolving door when pushed.  The door will commence operating when the red button is pulled.

To stop the door from moving in a non-emergency situation, turn the key switch to OFF.  This will deactivate the door and turn it off until the key switch is turned to the ON position.

The three (3) switches on the control box perform the following functions:

LEFT SWITCH in the TOP POSITION means "HI-SPEED CONTINUOUS"

LEFT SWITCH in the MIDDLE POSITION means "AUTO OPERATION"

LEFT SWITCH in the BOTTOM POSITION means "LO-SPEED CONTINUOUS"

MIDDLE SWITCH in the TOP POSITION means "CANOPY LIGHTS ON"

MIDDLE SWITCH in the BOTTOM POSITION means "CANOPY LIGHTS OFF"

RIGHT SWITCH in the TOP POSITION means "POSITION DOOR"

RIGHT SWITCH in the MIDDLE POSITION means "AUTO OPERATION"

RIGHT SWITCH in the BOTTOM POSITION means "STANDY CONTINUOUS"

For normal operations the Left and Right switches should be left in the middle positions.  The middle switch should be left in the "ON" position.

Any problems/abnormalities with any of the doors should be immediately reported to the Superintendent and/or either Handyman.  An Incident Report should also be written and submitted to the Management Office to document any problems with any of the front doors.

INCIDENT REPORTS

   Communication between the Front Desk and the Management Office is the basis for providing high levels of service to the building's residents.  The purpose of the Incident Report is to advise Management of any occurrences during your shift other than routine matters.  This includes but is not limited to, resident complaints about other residents, noise, fliers under doors, parking problems, fire alarm activation, etc.  When filling out an Incident Report it is important to include all pertinent information identifying who you are writing the report about, what the incident was, when it happened, where it occurred and if possible how it happened.

The Incident Report does not take the place of noting incidents in the Log Book. You must give a full account of the incident in the Log Book and then add "Incident Report completed and submitted to the Management Office".

A blank Incident Report form is attached. (See Appendix #4)   A sample of a completed Incident Report is attached as Appendix #5.

This is a vital and important part of your duties. If you are unclear or uncertain as to this requirement, additional training can be arranged.

INFRACTIONS

The Rules and Regulations governing the employees of The James Monroe are clearly listed in Appendix #9 attached. It is essential that all employees read the Rules and Regulations.

INTRUSION ALARMS

At the present time the building does not have a viable intrusion alarm system. This section will be completed at a later time after a new system has been selected and installed.

KEYS

There are a number of keys for the building which are left at the Front Desk.

UNIT KEYS. Residents may elect to leave their unit keys at the Front Desk to facilitate the service of a cleaning service, real estate agents, etc. This is permitted only if the keys are left for one day and picked up by the resident at the end of the day. Keys are NOT permitted to be left on a permanent basis.

The Concierge must be aware of the identity of each of the General Building Keys and how each is to be used. If you are unclear as to what the keys at the Front Desk do or how you are to handle them, you must seek additional training from your Supervisor.

LAUNDRY MACHINES/WASHERS/DRYERS

The James Monroe has Laundry Rooms on each floor. The washers and dryers are owned and maintained by the Association. The machines are operated through the use of a card which can be purchased from the laundry card vending machine located in the service corridor. Additional "credits" can be added to the cards through the same machines.

If a resident reports a problem with a washer or dryer, please ask for specific details. Record the information in the Washer/Dryer Log Book located at the Front Desk. The Concierge should then report the incident to the Superintendent.

Individual washing machines and dryers are NOT permitted in any unit at The James Monroe, with the exception of the following units: 3202, 3402, 3206, 3406, 3209, 3409, 3214, 3414, 3203, 3403, 3205, 3405, 3210, 3410, 3212, and 3412. If you should see someone attempting to move or take delivery of a washing machine and/or dryer into the building, please report such activity to the Management Office.

12

LOADING ZONE

The parking spaces directly in front of the building entrance are for loading/unloading ONLY for 20 minutes maximum.  Cars using the loading zone must park and leave the handicap ramp accessible. The Concierge is responsible for monitoring this area.  It may become necessary for you to ask a resident to move their car if they exceed the 20-minute time limit.  Report any abuse of loading zone parking to the Management Office.

LOBBY SHADES

The shades should be lowered between  the hours of  7:00 and 8:00 AM every day unless it is raining or overcast and should be raised every afternoon after the sun has gone down.  It is not necessary to raise or lower the top shades.

LOCKOUTS

As a courtesy, the Superintendent will assist residents that are locked out of their units.  If a resident comes to the Front Desk to report that they are locked out, the Concierge must first determine that the person is a resident of The James Monroe.  The Concierge should then notify the Superintendent.  The Concierge must also inform the resident that there is a fee for this service of $25.00.  If the lockout service is requested between the hours of 12:00 midnight and 6:00 AM, the Lockout fee is $40.00. Lockouts must be recorded in the Incident Log and create a Work Order.

LOG BOOK

A Log Book has been provided at the Front Desk for the Concierge to record events of the day.  Events need not be unusual or extraordinary.  The Concierge is merely to report the typical events of the day. The date and day of the week is to be recorded at the top of each page for easy reference.  Each page is to be completed before proceeding to the next page.  Since the Management Office does not review the Log Book every day it is essential that you specifically communicate any extraordinary event directly to the Management Office.  Please note that the Log Book does not supersede or replace the need for Incident Reports.

MANAGEMENT AGENT (PROPERTY MANAGER)

The association has hired a professional property management company to administer the day-to-day business of The James Monroe.

Management Company: Taylor Management Company

Onsite Property Manager: Dilia Pimentel                Onside Property Administrator: Rakhi Upadhyay

13

## MEETING ROOM

The room adjacent to the Management Office is designated as the Meeting Room. This room is used for the Board of Directors' Meetings. In addition, this room can be rented by the residents of The James Monroe for private parties. If residents come to the Front Desk to inquire about renting the Meeting Room, please refer them to the Management Office. At the end of each week, the Management Office will provide the Front Desk with a Schedule of Events that will include rentals of the Meeting Room. The Concierge should be aware of when private parties are scheduled. (Appendix #8)

## MOVE IN/OUT PROCEDURES

Move ins/outs are coordinated through the Management Office. Residents and / or Pending Residents must complete the Move-In / Move-Out Form and pay the applicable fee two (2) weeks in advance. (Appendix #9)

Once the Management Office has made the proper arrangements with a resident to move in or move out, including collecting the proper fees, the event will be included on the Weekly Schedule.

If someone attempts to move in or move out, without proper authorization, you are to notify the Superintendent. If the Superintendent is not available, notify either of the Handymen. Fill out an Incident Report to document the event. Move in/outs must be concluded by 6:00pm. All moves must be done by the service entrance.

## OPEN HOUSES

As the name implies, an Open House is a device sometimes used by Realtors and homeowners when they are trying to sell a home. Open Houses are Only permitted on Sundays at The James Monroe. Realtors wishing to show units must accompany their clients at all times. Prospective buyers/renters are not permitted to "tour" the building alone. All Realtors and visitors must sign the Guest Log upon entering The James Monroe. If a Realtor does not accompany their clients to and from the specific units, you must notify the Management Office so further action can be taken with the Realtor.

## PAYDAY

Employees of The James Monroe are paid on Fridays. Paychecks are distributed by the Superintendent and/or the Management Office. Please do not ask for your paycheck any earlier than the scheduled payday. If there is something wrong with your paycheck, please bring it, along with the stub, to the Management Office. Please do not "conduct" business in the building involving your paycheck or at any place other than the Management Office.

## PACKAGE ROOM

The room located by the service area has been designated as the Package Room. The primary purpose of this room is to temporarily store packages, laundry and/or dry cleaning for residents of The James Monroe. When packages, laundry and/or dry cleaning arrive at the building, the Concierge is to log the incoming items in Edge, (Appendix #10). The next step in preparing the incoming items is to label the packages, laundry and/or dry cleaning with the appropriate Edge Label. The residents will receive an email alerting them that they have a package, laundry and/or dry cleaning, (Appendix #12). When the residents pick up their packages from the package room, he/she must ask the resident to sign on the iPod touch. At that time, the Concierge then retrieves the corresponding item for the resident.

At the change of shifts, the Concierge coming on duty MUST communicate with the Concierge coming off duty and MUST perform an audit of the log(s) against the actual items in the Package Room and initial the log(s) when the audit is completed. If there are any discrepancies in the audit, an Incident Report must be written and submitted to the Management Office.

The Package Room is not intended to be a "holding area" for any items left by any residents such as baby seats, suitcases, clothing, etc.


PARKING

Residential Parking is available through Central Parking System. Applications are available at the 50 River Drive South location adjacent to the Duane Reed. (Appendix #13)

PERMISSION TO ENTER (PTE)

A Permission to Enter (PTE) is an authorization that a resident or owner of The James Monroe would approve which allows the Association's representatives to enter their unit for the purpose of performing a repair or inspection, etc. (Appendix #14)

PERSONAL COMMUNICATIONS

Personal Communication devices such as cell phones, two-way radios, etc. are not to be used by the Concierge while he/she is on duty. If you need to make a personal call, you can do so while you are on break or during your mealtime. Plugging in computers for the use of online services such as AOL, MSN, etc. is strictly prohibited.

PET RULES, REGULATIONS AND FEES

There is an extensive rule concerning pets at The James Monroe. We urge you to read and become familiar with this and all of the Rules and Regulations. A copy of the Rules and Regulations are attached as Appendix #15. For quick and easy reference, Concierges should be aware of the following:

*Pets at The James Monroe must be registered with the Management Office. The registration process includes a pet fee (for dogs only).

*No more than two (2) dogs are permitted in any one unit at The James Monroe

*Dogs registered after May 1, 1997 is limited to 50 pounds in weight.

*Pets must be leashed whenever they are on or in the Common Areas of The James Monroe

*Pet owners are expected to clean up after their pets.

*Pets are not to be tied up to any stationary object in the common areas, including, but not limited to terraces or balconies.

*Pets must not cause noise that disturbs any other Residents.

Any Concierge that becomes aware of any resident violating the Rules and Regulations concerning pets should bring this to the attention of the Management Office.

PSE&G

Whenever PSE&G (the gas and electric utility company) is at the building for the purpose of turning or shutting off electrical service, please write the affected units in the Log Book and add a description of the service being performed such as "Turned Service Off".  PSE & G can be contacted by telephone at 800-436-7734.

RING ROAD

Ring Road is the name of the circular road in front of The James Monroe which is a private roadway. Maintenance of the Ring Road, including snow removal is the responsibility of the LeFrak Organization (the developer of The James Monroe and Newport).  The LeFrak Organization is also responsible for manning the Guard House. The Security Booth on Ring Road can be contacted by telephone at 201-626-2086 or 201-626-3607.

If the guard from the security booth calls and asks you to call a resident to advise them that there is a car in Ring Road parked in excess of twenty-five (25) minutes and that it should be moved, follow this procedure:

Make an entry in the Log Book.   Obtain the guard's full name and note the time and unit number for future reference.

RULES AND REGULATIONS (HOUSE RULES)

A set of Rules and Regulations, set forth by the condominium Association, has been put into place for each resident of The James Monroe. Copies of the Rules and Regulations have been provided to each resident of The James Monroe in their Welcome Package.  A copy of the Rules and Regulations are attached to this Procedures Manual. Each Concierge should be familiar with the Rules and Regulations. When a resident violates the Rules and Regulations the Concierge should always make a written notation in the Log Book.  Additionally, an Incident Report should be written and turned into the Management Office. (Appendix #16)

16

SERVICE REQUESTS / WORK ORDERS

Whenever a resident of The James Monroe requests or requires service (maintenance) in his/her unit, this request must be put in writing using the form supplied by the Management Office.  Have the resident explain to you what type of service or maintenance is being requested.  This information should be neatly written on the lowest numbered Service Request form.  Additionally, the following information should also appear on the form:

1. DATE: Insert the date the request is filled out
2. TIME: Insert the time the request is filled out
3. UNIT NUMBER: Insert the unit number that is requesting the service
4. RESIDENT'S NAME: Write the full name of the resident requesting service
5. RECEIVED BY: Write the Concierge's name receiving the service request
6. WORK TO BE DONE: Briefly describe the problem and location i.e., bathtub drain clogged in master bathroom.

Ask the resident to check-off and sign the Work Order acknowledging (Permission to Enter) in order to have the work performed. (Appendix # 17)

The Concierge should complete the request form- not the resident.  The Concierge should give the bottom portion of the form to the resident.  If a mistake is made, write VOID on the form and return it to the Management Office.  Do not throw the request form away.  Voided forms must be logged in the work order program in the Management Office. (Appendix 18)

SHIFT CHANGING

When a Concierge wishes to change/switch his/her shift with another Concierge, it is your responsibility to notify the Management Office and/or the Superintendent at least two (2) days in advance for the proposed shift change.

SICK DAY PROCEDURES

Concierges are required to call the Front Desk when they are out sick.  We insist that if you are calling in sick that you do so with a minimum of four (4) hours.  If you are the Concierge calling out sick, please keep in mind that we need as much advance notice as possible. You know more than anyone that our labor pool is not very large.  If you are working at the Front Desk and you should receive a call from another employee advising you that he/she will be out sick, you are to immediately contact the Superintendent who will either arrange coverage and/or overtime.

If the Superintendent asks you to make calls in an attempt to cover the shift, you are to call fellow Concierges.

SIDE JOBS/PRIVATE WORK

As you are aware, a "side job" is non-Association work that an employee does for a resident. It is done before or after working hours or during days when the employee is not scheduled to work. "Side-jobs" cannot be performed during breaks or mealtimes. Additionally, any employee who calls in sick and is found to be performing a "side-job" will be disciplined accordingly. Conversations with residents about "side jobs" and phone calls about "side -jobs" are not to be done during working hours. "Side-jobs" are not to be written upon Service Request Forms. Do not call an employee (Superintendent, Handyman, etc.) away from their assigned work to take a phone call or speak to a resident at the Front Desk regarding a "side -job". Take a message and bring it to the Management Office. If a resident is upset about any aspect of a "side- job" (work not done, not started, not completed, etc.) they must take the matter up with the person involved (during non working hours) as this work is not the Association's responsibility. It is strongly recommended that you only accept "side- jobs" for such work that you possess a skill(s). Furthermore, you should never accept "side- jobs" that require licensed professionals (i.e. plumbing or electrical licenses).

NOTICES (EMERGENCY)

During regular business hours the Management Office would create and photocopy Notices for events such as water shut down, etc. A file of these types of signs has been made in the event one is needed when the Management Office is closed (after hours, weekend and holidays). If such a Notice needs to be distributed the Concierge should:

1. Consult with the Superintendent and/or either Handyman
2. Determine which Notice is needed
3. Have the Notice photocopied (once) before any information is filled out
4. Fill out the appropriate information where applicable (dates, times, floor affected, etc)
5. Have the Superintendent and/or either Handyman make sufficient copies (using the copier in the Management Office
6. Have the Superintendent and/or either Handyman post and/or distribute the Notice accordingly

If it becomes necessary to post a Notice while the Management Office is closed, please provide the Management Office with a copy of one of the Notice for their files. Additionally, an Incident Report should be filled out and turned in.

SMOKING POLICY

There is no smoking in the Commons Areas of The James Monroe. This includes the Lobby, Mailroom, Service Corridor, Community Room, Employee Break Room, Management Office, and Front Desk area, Elevators, Elevator Lobbies, Hallways and Stairwells. The only place where someone is permitted to smoke at The James Monroe would be outside the building or inside a unit. If you observe someone walking into the building with a lit cigarette, pipe or cigar, you are to politely ask that person to step outside and extinguish his or her smoking material.

SUPPLY OF FORMS

It is the responsibility of the Concierge working the 3:00 PM to 11:00 PM shift on the day before weekend or holiday to make certain there is an adequate supply of forms at the Front desk.  Check your supply BEFORE the Management Office closes.

## TIME CLOCK

All employees of The James Monroe are required to punch a time card before and at the conclusion of their shift.  The Superintendent is responsible to provide time cards at the beginning of the work week.  If the time clock does not properly indicate the time that you have punched, you are to alert the Management Office and/or the Superintendent.

## TIPS (GRATUITIES)

Tips/Gratuities should NEVER be solicited from residents.  Even making a subtle hint is inappropriate.  This rule applies year-round.  Any employee found to be soliciting a tip; gratuity or holiday present will be disciplined.

## UNIFORMS

All Concierges are required to wear the current uniform that is provided and maintained by the Association.  If any Concierge has a problem with their uniforms, please speak with the Management Office.

## VACATION REQUESTS / REQUEST FOR LEAVE

All requests must be presented to the Management Office in writing.  Before a vacation request is presented to the Management Office, it must be approved by the Superintendent and it must state who will be covering the shifts in your absence. (Appendix #19)

## VENDING MACHINES

There are two vending machines in the Service Corridor.  These machines are intended for the use of the residents and employees of The James Monroe and are owned by a vending machine company which is solely responsible for them.  If anyone has a problem with the machines they must report it to Bestway Vending & Coffee Service at 201.332.6402.

## WALKIE-TALKIES (2-WAY RADIOS)

The Maintenance Staff of The James Monroe are all equipped with walkie-talkies.  A walkie-talkie on the same frequency is stationed at the Front Desk.  When using this equipment, speak clearly and slowly.  Remember that when you are communicating utilizing this device everyone else that has a radio turned on is also listening (including any residents that may be nearby).  "On the air" profanity, noises, playing music, etc. will not be tolerated.  When you are not talking on the walkie-talkie it should remain in its recharging base.  Report any abnormalities with the Front Desk walkie-talkie to the Management Office and/or the Superintendent.  An Incident Report should also be filled out.

19

WATER CONTAMINATION

In the event of water contamination (which can happen when a water main breaks), the Concierge shall work with the other members of the building's staff in any effort to properly notify the residents.   The water company will advise the proper instructions to be communicated.

WATER SHUT OFF PROCEDURES, EMERGENCY

In the unlikely event that you will need to turn off the water supply to The James Monroe building, it is accomplished (in the Fire Pump Room) in accordance with the following instructions:

To turn off the water

1. Located in the middle of the pump control panel, there are three (3) BLACK rotary switches for pumps #1, 2 and 3.  Turn each switch (one at a time) to the OFF position.
2. Turn off the two (2) BLUE vales, located below the pump control panel, by squeezing the handles (one at a time) and then turning each valve's handle down, ¼ of a turn, until the handle is perpendicular to the floor.

To restore the water

1. Turn the two (2) BLUE valves ON by squeezing the handles (one at a time) and then turning each valve's handle up, ¼ of a turn, until the handle is parallel to the floor.
2. Turn on the three (3) BLACK rotary switches (one at a time) located in the middle of the pump control panel to the AUTO position.

WEEKLY SCHEDULE

A schedule indicating Move-Ins, Move-Outs, Deliveries, Alterations / Renovations and Meeting Room reservations is prepared by the Management Office and it can be viewed in Edge.

WHEELCHAIR

The James Monroe has a wheelchair that is available to residents for brief periods (i.e., for transportation from their unit to a waiting car, or from a car to their unit.  The Concierge should note the unit number that borrowed the wheelchair, and call if not returned.

ER 6a

# EMPLOYEE WARNING NOTICE

| Date: | 1/21/2019 |
|---|---|
| Employee Name: | John Reyes |
| Job Title: | Concierge |

**CURRENT WARNING:**

| Date of Violation: | 1/21/2019 |
|---|---|
| Time of Violation: | 7:40 pm |
| Violation Location: | Package Room |
| Type of Violation: | • Tardiness |
| | • Carelessness |
| | • Conduct |
| | • Uncooperative |
| | • **Substandard Work** |
| | • Disobedience |
| | • Attitude |
| | • Safety |
| | • **Absence** |
| | • Other  - Failure to follow instruction / notify Mgmt |
| | • Insubordination |
| | • Security Violation |

| Employee Statement: | |
|---|---|
| James Monroe Statement: | **7:40 pm-** John Reyes leaves for break. John Reyes returns at 8:30 pm to the package room while Ramon was covering, keeping the on-duty Ramon unable to do his work. John Reyes took 50 minutes as 30 minutes are allowed. *(Absence to post, Substandard work)* |

**NO STATEMENT IN EMPLOYEE BOX INDICATES AGREEMENT WITH JAMES MONROE STATEMENT. I HAVE READ THE STATEMENT & UNDERSTAND IT.**

Employee refused to sign the

| Employee Signature: | | Date: | |
|---|---|---|---|
| Manager Signature: | | Date: | 8/7/19 |
| Super Signature: | | Date: | 3/7/1 |
| Shop Steward: | | Date: | |

CR 66

# EMPLOYEE WARNING NOTICE

| Date: | 2/4/2019 |
|---|---|
| Employee Name: | John Reyes |
| Job Title: | Concierge |

**CURRENT WARNING:**

| Date of Violation: | 2/4/2019 |
|---|---|
| Time of Violation: | 4:07 pm/ 4:30pm/ 7:38pm |
| Violation Location: | Package Room |
| Type of Violation: | • **Tardiness**<br>• **Carelessness**<br>• Conduct<br>• Uncooperative<br>• **Substandard Work**<br>• Disobedience<br>• Attitude<br>• Safety<br>• Absence<br>• Other  - Failure to follow instruction / notify Mgmt<br>• Insubordination<br>• **Security Violation** |
| | |

| Employee Statement: | _____<br>_____<br>_____<br>_____ |
|---|---|
| James Monroe Statement: | **4:07 pm-** John Reyes was receiving packages while using facetime on his cellular phone. *(Substandard work/ Security Violation)*<br><br>**4:30 pm-** Resident was picking up package. John Reyes allowed resident to look for his package. John Reyes had his phone in his hand while on facetime. *(Substandard work/ Security Violation)*<br><br>**7:38 pm-** John Reyes was sitting in back of the package room on his phone. Charge wire and phone visible. Footage shows he is on facetime. *(Substandard work)* |

**NO STATEMENT IN EMPLOYEE BOX INDICATES AGREEMENT WITH JAMES MONROE STATEMENT. I HAVE READ THE STATEMENT & UNDERSTAND IT.**

Employee refused to sign JR

| Employee Signature: | | Date: | |
|---|---|---|---|
| Manager Signature: | | Date: | 3/7/19 |
| Super Signature: | | Date: | |
| Shop Steward: | Bill Cain | Date: | 3 7 19 |

# EMPLOYEE WARNING NOTICE

| | |
|---|---|
| Date: | 2/18/2019 |
| Employee Name: | John Reyes |
| Job Title: | Concierge |

**CURRENT WARNING:**

| | |
|---|---|
| Date of Violation: | 2/18/2019 |
| Time of Violation: | 3:47 pm / 4:56 pm |
| Violation Location: | Package Room |
| Type of Violation: | • Tardiness<br>• **Carelessness**<br>• Conduct<br>• Uncooperative<br>• **Substandard Work**<br>• Disobedience<br>• Attitude<br>• Safety<br>• Absence<br>• Other - Failure to follow instruction / notify Mgmt<br>• Insubordination<br>• **Security Violation** |
| | |

| | |
|---|---|
| Employee Statement: | |
| James Monroe Statement: | **3:47 pm-** John Reyes uses *Keylink* while on phone. *(Careless / Substandard work)*<br><br>**4:56 pm-** John Reyes puts on headphones, has them on when helping resident. He has to remove headphones to obtain package, while on his phone. Also a security violation as he cannot hear security *(Carelessness/ Substandard work/ Security Violation)* |

**NO STATEMENT IN EMPLOYEE BOX INDICATES AGREEMENT WITH JAMES MONROE STATEMENT. I HAVE READ THE STATEMENT & UNDERSTAND IT.**

*Employee refused to sign*

| | | | |
|---|---|---|---|
| Employee Signature: | | Date: | |
| Manager Signature: | | Date: | 3/7/19 |
| Super Signature: | | Date: | |
| Shop Steward: | | Date: | 3/7/19 |

CR 6d

# EMPLOYEE WARNING NOTICE

| Date: | 2/24/2019 |
|---|---|
| Employee Name: | John Reyes |
| Job Title: | Concierge |

**CURRENT WARNING:**

| Date of Violation: | 2/24/2019 |
|---|---|
| Time of Violation: | 4:14pm-4:36pm |
| Violation Location: | Package Room |
| Type of Violation: | • Tardiness<br>• **Carelessness**<br>• Conduct<br>• Uncooperative<br>• **Substandard Work**<br>• Disobedience<br>• Attitude<br>• Safety<br>• Absence<br>• Other – Failure to follow instruction / notify Mgmt<br>• Insubordination<br>• **Security Violation** |
| | |

| Employee Statement: | |
|---|---|
| James Monroe Statement: | **4:14 pm-4:36 pm-** John Reyes uses phone and plays video games accompanied by a juvenile resident. Juvenile is allowed to remove packages.<br>Food delivery arrives, John Reyes is on his cell phone playing a shooting game with the juvenile resident and calling on building phone. *He allows delivery person to proceed to unit without taking any identification. This is a security violation as he is not monitoring visitors.* (Security Violation/ Carelessness/ Substandard Work)<br><br>**4:33-4:35 pm-** Juvenile resident is allowed to handle and sort packages. *(Carelessness/ Substandard Work/ Security Violation)* |

**NO STATEMENT IN EMPLOYEE BOX INDICATES AGREEMENT WITH JAMES MONROE STATEMENT. I HAVE READ THE STATEMENT & UNDERSTAND IT.** *Employee refuse to sign for*

| | | | |
|---|---|---|---|
| Employee Signature: | | Date: | |
| Manager Signature: | *[signature]* | Date: | 3/7/19 |
| Super Signature: | | Date: | |
| Shop Steward: | *[signature]* | Date: | 3/7/19 |

# EMPLOYEE WARNING NOTICE

| | |
|---|---|
| Date: | 9/13/16 |
| Employee Name: | John Reyes |
| Job Title: | Concierge/porter |

**CURRENT WARNING:**

| | |
|---|---|
| Date of Violation: | 9/8/16 |
| Time of Violation: | 9:28pm |
| Violation Location: | n/a |
| Type of Violation: | • Tardiness |
| | X Carelessness |
| | • Conduct |
| | • Uncooperative |
| | • Substandard Work |
| | • Disobedience |
| | • Attitude |
| | x Safety |
| | • Absence |
| | • Other - Failure to follow instruction / notify Mgmt |
| | • Insubordination |

| | |
|---|---|
| Employee Statement: | |
| James Monroe Statement: | On September 8, 2016 at approx.. 9:28pm you left the front desk unattended As you are aware this puts the building residents in danger and safety situation. The next time this violation occurs ( and there is no immediate threat safety of the residents ) a  written warning will be applied |

**NO STATEMENT IN EMPLOYEE BOX INDICATES AGREEMENT WITH JAMES MONROE STATEMENT. I HAVE READ THE STATEMENT & UNDERSTAND IT.**

| | | | |
|---|---|---|---|
| Employee Signature: | | Date: | |
| Manager Signature: | | Date: | |
| Super Signature: | | Date: | |
| Shop Steward: | | Date: | |

# EMPLOYEE WARNING NOTICE

| Date: | 1/30/17 |
|---|---|
| Employee Name: | John Reyes |
| Job Title: | Concierge |

**CURRENT WARNING:**

| Date of Violation: | 1/24/17 |
|---|---|
| Time of Violation: | 8:45pm |
| Violation Location: | n/a |
| Type of Violation: | •   Tardiness<br>X   Carelessness<br>•   Conduct<br>•   Uncooperative<br>•   Substandard Work<br>•   Disobedience<br>•   Attitude<br>x   Safety<br>•   Absence<br>•   Other  - Failure to follow instruction / notify Mgmt<br>•   Insubordination |

| Employee Statement: | |
|---|---|
| James Monroe Statement: | On January 24, 2017 at approx. 8:45pm you allowed a toddler inside the package This puts the Association at risk. This is a danger and safety situation. The next time this violation occurs (and there is no immediate threat safety of the residents) a  written warning will be applied. |

**NO STATEMENT IN EMPLOYEE BOX INDICATES AGREEMENT WITH JAMES MONROE STATEMENT. I HAVE READ THE STATEMENT & UNDERSTAND IT.**

| Employee Signature: | Date: | |
|---|---|---|
| Manager Signature: | Date: | |
| Super Signature: | Date: | |
| Shop Steward: | Date: | |

# EMPLOYEE WARNING NOTICE

| Date: | 12/4/17 |
| --- | --- |
| Employee Name: | John Reyes |
| Job Title: | Concierge |

**CURRENT WARNING:**

| Date of Violation: | 12/2/17 |
| --- | --- |
| Time of Violation: | 8:45pm-9pm |
| Violation Location: | n/a |
| Type of Violation: | • Tardiness |
| | X Carelessness |
| | • Conduct |
| | • Uncooperative |
| | • Substandard Work |
| | X Disobedience |
| | • Attitude |
| | X **Safety** |
| | • Absence |
| | X Other - Failure to follow instruction / notify Mgmt |
| | • Insubordination |

| Employee Statement: | _Following saw long line by elevator approach situation to limit the people by the elevator pulan approach conyroffsional situat ... to me conloscone lighton Continue following them to me to my position on friday doc l around 7-9pm order me to stop out of post_ |
| --- | --- |
| James Monroe Statement: | John has been warned several times about his lapse in security when he is the doorman in the front. He frequently takes breaks and leaves the front desk. ALso, this weekend he was seen speaking to a resident for over 10 minutes and was not as his post. This is a serious lapse in security. The most important job as a doorman is security and must always remain at his post. IF this continues suspenion and possible termination may follow. |

**NO STATEMENT IN EMPLOYEE BOX INDICATES AGREEMENT WITH JAMES MONROE STATEMENT. I HAVE READ THE STATEMENT & UNDERSTAND IT.**

| Employee Signature: | | Date: | |
| --- | --- | --- | --- |
| Manager Signature: | | Date: | |
| Super Signature: | | Date: | |
| Shop Steward: | | Date: | |

## Sent on Jul 21, 2018 at 3:44 PM

**To: 985 Recipients**

**From: James Monroe Condominium Association [management@jamesmonroe.co]**

**Subject: Security incident reported by our staff**

Dear Resident,

One of our Association night time concierge reported an security incident happened on Thursday, July 20th at 1AM. The camera footage is being currently reviewed.

A stranger was trailing a woman who lives in the building from Newport PATH station. The concierge identified the stranger walking very close to the woman and stopped the individual who tried access into the building. The same individual attempted second time to enter the building along with another resident at close proximity. After the concierge called Newport security the individual attempted to get access to neighboring John Adams building. By the time Newport security arrived the individual ran away.

Couple of similar incidents has happened at Avalon cove in the past and some are not even reported in the news. One such example similar to past is listed below. The incident in the news look exact same as our Association staff reported.

https://www.nj.com/jjournal-news/index.ssf/2012/04/jersey_city_police_beat_two_ch.html

### Follow-up actions to be taken on the Management and volunteer security committee end

1. Coordinate with all 5 Newport Condominium Associations and Lefrak, Newport Property Owners Association (NPOA) to address multiple security incidents reported in the neighborhood and by our Association staff
2. Steps NPOA will take to increase the security patrol around the PATH station and inside the ring road. Cycle patrols at the cost of reducing mobile patrol is unacceptable. If possible bring back the manual security guard station to life as it used to be few years back.
3. Request NPOA to add additional lights in Newport wherever it's dark at night time
4. Call for Jersey City Mayor office and Sheriff office to meet with the residents in the new large party room. Other neighboring Condo Association community members will be also invited for the session.
5. Moving forward Mandatory 2 weeks notice needed to approve construction permit to check the vendor background before permitting the unit renovations in the community.
6. All vendor delivery such as Fresh direct or other deliveries after 10 PM will be stopped except for the food deliveries. Please plan accordingly.
7. After 11PM building access is allowed only through the front handicap door access using Key FOB system. Vestibule revolving door and an additional manual emergency door will be locked. Vendor should soon enable the Key FOB system which is already installed.
8. Use of shopping carts after 11PM via back service entrance please call in advance for the secondary staff on duty to provide you an access.
9. Resident access via back service entrance door is disabled for long time. Resident exit via back service entrance door after 10 PM will be disabled with a automatic locking system. In emergencies all doors will automatically open
10. As per insurance company recommendation cameras to all Hallways will be installed soon.
11. Association staff will do a daily walk-through of the Hallway in the afternoon and remove any newspapers or other fliers, papers piling up outside the unit door. This is a sign someone is not at the unit for long time or on travel

12. To Avoid residents throwing stone tiles, large oxygen cylinders, plastic chairs and fire combustible material via compactor chute cameras will be installed on all compactor rooms.

## Considerations for residents to help in improving the community security

1. **Do not panic** with security incidents reported. Rather be happy with the free flow of communication and being vigilant based on security incidents reported
2. **If you see something say something**. Report with date/time of an incident to the management office without waiting for the Board Open session meeting.
3. While ordering food delivery add a special note "**Id required**" for building access
4. Report if the food delivery was made to your unit without the staff calling you
5. **Look behind if someone is following you at night time** while walking from the PATH station. Seek immediate help.
6. Many residents keep their **unit doors open**. It's a security risk and **fire hazard**.Continued violations will be reported to the Fire department. Several food delivery person coming in to the Hallway could be noticing the behavior of a specific unit door always open.
7. **Double lock your unit doors when leaving. Just closing the doors is not secure. With small plastic or credit card the door can be open with a tight push**
8. With the change of lease change your rental unit door keys
9. Secure your keys through auditable Key Track system. Staff will not accept loose key's in the envelope.
10. Unit owners who rent their unit should plan to do background check of new tenants before renting. This practice is similar to how Lefrak rents their apartment units.
11. Individual unit owners as an option, consider installing home security device which are WiFi enabled. This alerts you on your mobile or security company based on system you choose to install. Many units have enabled wireless security system. Some tips to choose right security product for your unit

https://www.pcmag.com/article2/0,2817,2498510,00.asp
Wink Lookout Smart Security Starter Kit with Wink Hub from Amazon which doesn't require monthly fees.

http://simplisafe.com monthly fee and automatic alert system

Residents interested to coordinate weekly security committee meeting, improving security protocols and procedures for the community email with your interest to management@jamesmonroe.co

Please respect the efforts of the Management and Association staff who work hard in enforcing the security policies and procedures which volunteer residents of security committee  and Board is requesting it to be enforced.

## Security is everyone business. Be vigilant and report or recommend suggestions

Thank you

**Attachments: None**

**From:** Nithin Vinyak <nithin.fos@gmail.com>
**Sent:** Thursday, March 7, 2019 2:49 PM
**To:** Padman Palani <padmam@hotmail.com>
**Cc:** petersonza@yahoo.com <petersonza@yahoo.com>; tori_polie@mac.com <tori_polie@mac.com>;
ramsis.barsoum@verizon.net <ramsis.barsoum@verizon.net>; tonyjin92@gmail.com <tonyjin92@gmail.com>
**Subject:** Re: Basis for Termination - PLEASE VOTE

Yes from my side as well.


Nithin

On Thu, Mar 7, 2019 at 2:30 PM Padman Palani <padmam@hotmail.com> wrote:

Peter confirmed his yes for termination vote. Nithin kindly send in your vote.

Boards members voted yes for termination:

- Tony
- Ramsis
- Palani
- Peter

Boards members yet to vote:

- Nithin

Thanks,
PPalani

---

**From:** Padman Palani <padmam@hotmail.com>
**Sent:** Thursday, March 7, 2019 10:57 AM
**To:** Tony Jin
**Cc:** petersonza@yahoo.com; tori_polie@mac.com; nithin.fos@gmail.com; ramsis.barsoum@verizon.net
**Subject:** Re: Basis for Termination - PLEASE VOTE

1

Thank you.

Boards members voted yes for termination:

- Tony
- Ramsis
- Palani

Boards members yet to vote:

- Nithin
- Peter

Thanks,
PPalani

**From:** Tony Jin <tonyjin92@gmail.com>
**Sent:** Thursday, March 7, 2019 10:55 AM
**To:** Padman Palani
**Cc:** petersonza@yahoo.com; tori_polie@mac.com; nithin.fos@gmail.com; ramsis.barsoum@verizon.net
**Subject:** Re: Basis for Termination - PLEASE VOTE

I vote for termination.

Sent from my iPhone

On Mar 7, 2019, at 08:03, Padman Palani <padmam@hotmail.com> wrote:

Dear Board Members,

Good morning.

**Kindly vote on John Reyes termination by this noon**. Management has to prepare and issue the letter by 2 PM

Boards members voted yes for termination:

- Palani

Boards members yet to vote:

- Nithin
- Tony
- Ramsis
- Peter

2

Nithin will join by 11 AM to review the camera footage and vote. Peter knows the complete issue from start and will be here by noon to review the footage or based on Lou findings forwarded below he can make his decision.

Ramsis and Tony have already reviewed the footages Lou had downloaded.

Yesterday night reviewed 9 more new long footage for different dates and noticed the same pattern apart from what Lou had reported. I saw resident Juveniville managing the package room, delivering packages to residents, playing in the package room for hours, chatting with multiple residents for 20-30 minutes, leaving the package room unattended for 5-20 minutes, dancing, playing video games, online chatting, taking multiple breaks and not vigilantly monitoring the common area cameras.

We wish John Reyes new job and location may help him to change course without taking advantage of his father position, helps other staff to change course etc. We wish John Reyes good luck.

Thanks,
PPalani

---

**From:** Padman Palani <padmam@hotmail.com>
**Sent:** Wednesday, March 6, 2019 6:57 PM
**To:** petersonza@yahoo.com; tori_polie@mac.com; nithin.fos@gmail.com; tonyjin92@gmail.com; ramsis.barsoum@verizon.net
**Subject:** Fw: Basis for Termination

Dear Board,

Ramsis and I reviewed the camera this afternoon.

If you wanted to review the camera and make your decision (which I strongly recommend ) I will be available till 10 PM.

I want each member of the Board members to vote by tomorrow morning as we need to move on.

There is another incident with another staff who has been consistently stealing time as per Management staff report. We had to act on that early next week.

Regards,
PPalani
201-463-2597

---

**From:** Lou Capurso <Lou.Capurso@fsresidential.com>
**Sent:** Wednesday, March 6, 2019 4:23 PM
**To:** Padman Palani; Peter Sonza; nithin.fos@gmail.com Nithin; Tony Jin; ramsis.barsoum@verizon.net

3

**Cc:** Dillon Galler; Andrew Batshaw
**Subject:** Basis for Termination

Good Day to the Board,

In an effort to determine if basic security protocols are followed by our concierge staff we have found one individual, John Reyes who on the dates and times stated below violated basic security standards.

Based on the dates, times and activity listed below it is management's recommendation that John Reyes be terminated based on the below infractions and former writeups by previous managers.
All of the below listed activities are available via our security camera system and have been dumped. More examples of infractions are available.
See attached former writeups for John Reyes.

1. Monday, Feb. 4, 2019  4:07 PM John Reyes was receiving packages while on *facetime* on his phone. ***Substandard work, <u>Security violation</u>***
2.     "        "   "   "     4:30 PM Resident picking up package. John Reyes allowed resident to look for his package. He had his phone in his hand while on *facetime.*
***Substandard  Work, <u>security violation</u>***
3.     "        "   "   "     7:38 PM John Reyes sitting in back of the package room on his phone. Charge wire and phone visible. Footage shows he is on *facetime. **Substandard Work***
4. Monday, February 18   3:47 PM Uses *keylink* while on phone. ***Careless and Substandard Work***
5.     "        "           "     4:56 PM  Puts on headphones, has them on when helping resident. Has to remove headphones to obtain package while on his phone. ***Carelessness, Substandard Work, <u>security violation</u> as he cannot hear entering visitors.***
6. Monday, February 24   4:14-4:36 PM John Reyes uses phone and plays video games accompanied by juvenile resident. Juvenile is allowed to remove packages. Food Delivery arrives, John is on his cell phone playing a shooting game with the juvenile and calling on building phone. *He allows delivery person to proceed to unit without taking any identification.*
***Security violation as he is not watching entering visitors, carelessness and substandard work***
4:33-4:35 Juvenile handles packages and helps sort. ***Carelessness, Substandard work and <u>Security violation</u>***
7. Monday, January 21    7:40 PM Leaves for break. Returns at 8:30 PM to the package room while Ramon was covering, keeping the on-duty Ramon unable to do his work. Took 50 minutes as 30 minutes are allowed. **Absence to post, Substandard work.**

Please inform management of the Board's decision.

Lou Capurso
Community Manager

4



**LOU CAPURSO**
Community Manager

45 River Dr. S | Jersey City, NJ 07310
Direct 201-626-5657
Email Lou.Capurso@fsresidential.com
**www.fsresidential.com**

Follow us on | Facebook | Twitter | LinkedIn | YouTube

This e-mail is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. Any comments or opinions expressed in this document are the opinion of the individual sender, except when specifically stated to be the views of FirstService Residential. If you are not the intended recipient, please contact the sender by reply e-mail, forwarding all copies of the original message and any attachment(s). Thank you.

# Civil Case Information Statement

## Case Details: HUDSON | Civil Part Docket# L-001757-20

**Case Caption:** THE JAMES MONROE CON DOMINIUM
VS SERVICE EMPLOY

**Case Initiation Date:** 05/08/2020

**Attorney Name:** BENJAMIN E WIDENER

**Firm Name:** STARK & STARK PC

**Address:** 993 LENOX DR
LAWRENCEVILLE NJ 08648

**Phone:** 6098969060

**Name of Party:** PLAINTIFF : The James Monroe
Condominium a

**Name of Defendant's Primary Insurance Company**

(if known): None

**Case Type:** SUMMARY ACTION

**Document Type:** Verified Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business   bargaining representative

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
    **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

<u>05/08/2020</u>
Dated

<u>/s/ BENJAMIN E WIDENER</u>
Signed